UNITED STATES of America,
Plaintiff-Appellee,

v.

Herman MERS, Lester Mers, Randy James Myers, Paul J. Ferrante, Defendants-Appellants.

No. 81-7777.

United States Court of Appeals,
Eleventh Circuit.

March 21, 1983.

Rehearing and Rehearing En Banc Denied May 16, 1983.

Michael K. McIntyre, Federal Defender Program, Atlanta, Ga., for Herman Mers.

Bruce E. Pashley, Atlanta, Ga., for Lester Mers.

Kadish, Davis & Brofman, Mark J. Kadish, Atlanta, Ga., for Myers & Ferrante.

Julie E. Carnes, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before HILL and VANCE, Circuit Judges, and TUTTLE, Senior Circuit Judge.

VANCE, Circuit Judge.

The four appellants, Herman Mers, Lester Mers, Paul Ferrante and Randy Myers, appeal convictions for conspiracy to possess with intent to distribute marijuana, 21 U.S.C. §§ 841(a), 846, and aiding and abetting the distribution of marijuana, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Appellants raise divergent issues before this court but only two require serious treatment: whether a single defense attorney's representation of all four appellants at trial violated the right to effective assistance of counsel of Ferrante, Myers and Herman Mers, and whether Herman and Lester Mers were brought to trial within the time required by the Speedy Trial Act.

Their arrest on February 6, 1981 resulted from Herman Mers and his son Lester Mers having undertaken to sell a large quantity of marijuana to undercover DEA agents. Myers and Ferrante acted as armed guards during the planned exchange of the first 2,000 pounds. The Mers pled entrapment, contending that their involvement in the transaction resulted from pressure on Herman Mers by his neighbor, Michael Fiori, who was acting as a government informant. Myers and Ferrante claimed that they knew nothing of the marijuana; they were told that the marijuana-laden truck contained antiques which they were helping to protect merely as a favor to Lester Mers.

In January, 1981, Herman Mers and two undercover DEA agents flew to Atlanta to arrange the purchase. Over the succeeding week the plans were finalized. Between February 2nd and 6th, there were numerous meetings and conversations between the Mers and the DEA agents. Surreptitious tape recording of these conversations were introduced into evidence at trial. The conspirators agreed that Lester Mers would deliver the marijuana to one agent, while his father and another agent would remain at a restaurant. After the transfer of the drugs was completed, the key to the safe deposit box containing the money would be delivered to the Mers.

On February 6, Lester Mers accompanied a DEA agent to obtain the 2,000 pounds of marijuana from Lester's home. After examining the marijuana, which was stored in a truck, the agent told a second agent to drive the truck to New York. Paul Ferrante and Randy Myers were in a car a block away from the Mers' home while the marijuana was being inspected. One of the DEA agents testified that Ferrante and Myers began to follow the marijuana-laden truck. As they drove by and stopped, however, Lester Mers said "don't worry about the marijuana. Follow me. These guys are good for the money." Ferrante and Myers then followed Lester Mers and the agent to the restaurant where Herman Mers was waiting. As the party left the restaurant for the place where the money was actually to be exchanged, all four appellants were arrested. Myers was armed with a Luger pistol and a .38 caliber handgun, Ferrante was carrying a .357 magnum and agents found a .30 caliber rifle in the back seat of the car.

(1)

### Joint Representation of Multiple Defendants

Bruce Pashley, an Atlanta criminal defense attorney, represented all four defendants from their arrest until the end of their trial. Appellants contend that Pashley's multiple representation created an actual conflict of interest which was not sufficiently exposed due to the district court's failure to conduct an adequate hearing under the criteria of Fed.R.Crim.P. 44(c) and *United States v. Garcia*, 517 F.2d 272 (5th Cir.1975). We hold that although the district court erred in failing to conduct an adequate hearing on the conflict of interest issue, that error was harmless because no actual conflict of interest existed in this case.

We agree with appellants that the district court's failure to make full inquiry concerning the conflict issue violated rule 44(c) and *Garcia*. Rule 44(c) provides that whenever two or more criminal defendants who have been jointly charged are represented by the same counsel, the court "shall personally advise each defendant of his

rights to the effective assistance of counsel, including separate representation." *Garcia* articulated the standard for determining whether a defendant has voluntarily waived his right to conflict-free counsel. In *Garcia,* defendants in a federal criminal proceeding selected counsel to represent them. The trial court refused to allow the retained attorneys to serve as counsel because of a conflict of interest. In holding that defendants have the privilege of waiving their constitutional right to conflict-free counsel, the fifth circuit remanded the case for a hearing to ascertain whether the defendants had knowingly and voluntarily waived their sixth amendment protections.

The court detailed the procedures to be followed in making this determination, stating that district courts should adhere to a procedure similar to that promulgated in Fed.R.Crim.P. 11. 517 F.2d at 278. The court should address each defendant individually and advise him of the potential dangers of joint representation. The defendants must have the opportunity to question the court about the nature and consequences of their legal representation. "Most importantly, the district court should obtain a response from each defendant indicating that he has been advised of his right to effective representation, that he understands the details of the attorney's possible conflict of interest and the potential perils of such a conflict and that he voluntarily waives his Sixth Amendment protections." *Id.* at 278.

The district court was aware of attorney Pashley's potential conflict of interest. During the second day of trial, when the government's counsel learned that Pashley intended to raise the defense of entrapment on behalf of Herman and Lester Mers, he requested that the court conduct a *Garcia* hearing. The court asked Pashley whether he had discussed the matter with his clients. Pashley answered that he had not discussed it in the context of a conflict problem, since he saw no conflict. The district judge then described to the defendants the nature of the entrapment defense, after which she recessed the proceedings so that Ferrante and Myers, who were not asserting the defense of entrapment, could confer with Pashley.

Following the recess, Pashley advised the court that he had discussed the matter with his clients and invited the court to proceed with its inquiry. The judge then personally addressed Myers and Ferrante and determined that each felt that he had received an adequate explanation of his position relative to the entrapment defense advanced by the Mers. During this colloquy, Pashley noted that he was asserting an entrapment defense only with regard to the Mers and that his defense with regard to Ferrante and Myers was that they were simply doing a friend a favor, that they had conspired with no one and that they were guilty of nothing. The court then asked Myers:

THE COURT: ... To the extent there is any conflict between your position and that of Mr. Lester Mers and Mr. Herman Mers, do you waive your rights in connection with any such conflict?

MR. MYERS: I don't see any conflict, no, I don't.

THE COURT: If there is a conflict, do you consent to Mr. Pashley representing you as well as Lester and Herman Mers?

MR. MYERS: At this time, I do.

THE COURT: All right, and do you have any objection to Mr. Pashley raising the entrapment defense as he indicated he would?

MR. MYERS: No, Your Honor.

An almost identical line of inquiry was made of Ferrante. In a post trial order disposing of defendants' request for judgment NOV or a new trial, the court observed that "[d]efendants are correct that the inquiry undertaken by the Court at the request of the Government and despite defense counsel's position to the contrary, with regard to trial counsel's potential conflict of interest, did not meet the requirements of *United States v. Garcia* ...." In a later evidentiary hearing the judge admitted that "the admonition the Court gave to the defendants was not specific enough because it did not detail to the defendants exactly the nature of the conflict."

Thus, neither the probing inquiry mandated by rule 44(c) nor that required by *Garcia* was satisfied in this case. The district court did not specifically advise defendants of their right to separate representation, as required by rule 44(c). The district judge candidly admitted failing to comply with *Garcia*. But although her inquiry constituted error under *Garcia* and rule 44(c), that error will not require reversal unless Pashley's representation of these multiple defendants did in fact constitute an actual conflict of interest.

 Although joint representation of multiple criminal defendants creates a danger of counsel conflict of interest, the "mere fact of joint representation will certainly not show an actual conflict." *United States v. Medel,* 592 F.2d 1305, 1310 (5th Cir.1979). *Accord Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 1177–78, 55 L.Ed.2d 426 (1978); *United States v. Burroughs,* 650 F.2d 595, 598 (5th Cir.), *cert. denied,* 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981); *Foxworth v. Wainwright,* 516 F.2d 1072, 1076 (5th Cir.1975). Further, failure to comply with *Garcia* will not mandate reversal absent an actual conflict of interest. In *United States v. Benavidez,* 664 F.2d 1255 (5th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2963, 73 L.Ed.2d 1352 (1982), a defendant argued that noncompliance with rule 44(c) required reversal notwithstanding his failure to demonstrate actual conflict. The present fifth circuit rejected this argument, noting that the purpose behind rule 44(c) was to establish a "procedure for avoiding the occurrence of events which might otherwise give rise to a plausible post-conviction claim" concerning conflict of interest. *Id.* at 1258 (quoting Advisory Committee on Criminal Rules, Note to Rule 44(c), in Committee on Rules

of Practice and Procedure of the Judicial Conference of the United States, Preliminary Draft of Proposed Amendments to the Federal Rules of Criminal Procedure (February 1978) *reprinted in* 77 F.R.D. 507, 594 (1978) (Advisory Committee Note)). The court held that "neither the inquiry nor the advice is itself the goal of the rule; the goal is preventing conflicts. If there is no actual conflict, then the rule's purpose will not be served by reversal of a conviction." 664 F.2d at 1258.

In *United States v. Alvarez,* 696 F.2d 1307 (11th Cir.1983), we found the above reasoning from *Benavidez* persuasive. It would be the height of formalism to reverse a conviction because of literal noncompliance with a procedural rule when the evil that the rule has been designed to prevent has never occurred. The Advisory Committee Note to rule 44(c) supports this construction: "The failure in a particular case to conduct a rule 44(c) inquiry would not, standing alone, necessitate the reversal of a conviction of a jointly represented defendant." Advisory Committee Note, 77 F.R.D. 507, 603 (1978). Thus, appellants must demonstrate that Pashley's joint representation constituted an actual conflict of interest.

Three Supreme Court cases, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) and *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), define the standard for analyzing claims that counsel "suffered under a disability (such as conflict of interest) that subtly pervaded his entire conduct of the defense." *Stanley v. Zant.* 697 F.2d 955, 962 (11th Cir.1983) (parentheses in original).[1] The Court in *Glasser*

---

1. Our conflict of interest cases may be contrasted with the approach we take in analyzing cases such as *Washington v. Strickland,* 693 F.2d 1243 (5th Cir.1982) (Unit B en banc) and *Stanley v. Zant,* 697 F.2d 955 (11th Cir.1983) in which criminal defendants assert on appeal that "counsel's actual performance was inadequate, that specific actions or omissions of his attorney rendered his representation ineffective." *Stanley v. Zant,* 697 F.2d at 962. The

differences between these two general types of ineffectiveness have been discussed at length by courts and commentators alike. Professor Waltz distinguished between "extrinsic" pressures interfering with counsel's representation (such as conflicts of interest) and "intrinsic" ineffectiveness (such as failure to present defendant's only possible defense). *See* Waltz, *Inadequacy of Trial Defense Representation as a Ground for Post-Conviction Relief in Criminal*

established the principle that counsel's conflicting loyalties in multiple representation cases could lead to an unconstitutional impairment of a defendant's sixth amendment right to effective representation. Glasser and Kretske were codefendants in a conspiracy case. Despite Glasser's objection, the district court appointed Glasser's attorney to represent Kretske as well. The Supreme Court reversed, holding that the assistance of counsel "guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." 315 U.S. at 70, 62 S.Ct. at 465. Although ambiguous language in Glasser led courts to confusion regarding the test for demonstrating conflict of interest and for the need to show prejudice in multiple representation cases, see Lowenthal, *Joint Representation in Criminal Cases: A Central Appraisal,* 64 Va.L.Rev. 939, 973–74 (1978); Comment, *Conflict of Interests in Multiple Representation of Criminal Co-Defendants,* 68 J.Crim.L. & Criminology 226 (1977), under the facts of Glasser itself the conflict of interest was actual and ascertainable on appellate review. The conflict was underscored by defense counsel's cross-examination and in his attempts to counter evidence introduced by the government. Counsel's cross-examination of prosecution witnesses was circumscribed and hesitant, and in at least one instance the defense attorney conducted no cross-examination at all. The Supreme Court found that such conduct raised an inference that counsel's trial strategy was infected by conflicting obligations and divided loyalties. See Comment, 68 J.Crim.L. & Criminology, supra, at 230–31.

The Supreme Court reexamined the multiple representation issue in *Holloway v. Arkansas.* In *Holloway,* the district court appointed one public defender to represent three defendants charged with rape and robbery. The court denied defense counsel's repeated requests for appointment of separate counsel. As in *Glasser,* the Supreme Court inferred the conflict from counsel's actions and inactions at trial. The attorney for the defendants informed the court, in the presence of the jury, that despite his recommendation to the contrary all defendants wished to testify. Counsel argued that a conflict of interest was inevitable: he could not effectively examine any given defendant who was on the witness stand, because he had received information from each individually. The trial court rejected counsel's argument that he was bound to protect the interests of the non-testifying defendants while a codefendant was testifying. The attorney refused to question any of the defendants and they testified in a narrative form. Before each defendant took the stand, counsel stated that "I cannot ask you any questions that might tend to incriminate any one of the three of you . . . ." 435 U.S. at 480, 98 S.Ct. at 1176. The Supreme Court reversed the convictions, concluding that the trial judge erred in failing "either to appoint separate counsel or to take adequate steps to ascertain whether the risk [of a conflict of interest] was too remote to warrant separate counsel." *Id.* at 484, 98 S.Ct. at 1178. The Court strongly implied that reversal would be automatic "whenever a trial court improperly requires joint representation over timely objection." *Id.* Because the trial record may mask so much, and because a "conflict of interest hobbles the defense in a manner distinct from other forms of ineffectiveness," Tague, *Multiple Representation and Conflicts of Interest in Criminal Cases,* 67 Geo.L.J. 1075, 1077 (1979), an appellant asserting conflict of interest need not make a further showing of prejudice. *See Holloway,* 435 U.S. at 489–91, 98 S.Ct. at 1181–82; *Baty v. Balkcom,* 661 F.2d 391, 395 (5th Cir.1981), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982).

*Cases,* 59 Nw.U.L.Rev. 289, 301–41 (1964). *Compare Washington v. Strickland* (requiring prejudice in cases of intrinsic ineffectiveness) *with Baty v. Balkcom,* 661 F.2d 391 (5th Cir.

1981), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982) (not requiring prejudice in cases of extrinsic ineffectiveness).

Most recently, in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court stated that "the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 350, 100 S.Ct. at 1719; *see also United States v. Freeman,* 619 F.2d 1112, 1122 (5th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981); *United States v. Fox,* 613 F.2d 99, 102 (5th Cir.1980). We have held that "the standard imposed by the Supreme Court in *Cuyler* is met by proof of an actual conflict of interest. As a component of that proof, of course, petitioner also must show that counsel with the conflict was representing the petitioner actively." *Baty v. Balkcom,* 661 F.2d at 397.

We will not find an actual conflict unless appellants can point to "specific instances in the record to suggest an actual conflict or impairment of their interests." *United States v. Fox,* 613 F.2d at 102. Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical." Comment, 68 J.Crim.L. & Criminology, *supra* at 232 (parentheses in original). There is no violation where the conflict is "irrelevant or merely hypothetical"; there must be an "actual, significant conflict." *Foxworth,* 516 F.2d at 1077 n. 7. An actual conflict exists when the respective defenses of multiple defendants are inconsistent, *i.e.,* if "introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing." *Baty,* 661 F.2d at 395. The *Benavidez* court noted that the former fifth circuit cases reversing convictions on the ground of actual conflict of interest could be classified as falling into at least one of three rubrics:

(1) the conflict was brought to the trial court's attention at the outset of the trial or at the time when the conflict first became apparent; (2) one defendant had evidence that would have exculpated himself but inculpated a codefendant; (3) the prosecution's evidence offered defendant a theory under which he could prove his own innocence by proving his codefendant's guilt.

664 F.2d at 1259 (footnotes omitted).

Appellants Ferrante, Myers and Lester Mers argue that their various defenses were incompatible with the entrapment defense asserted by Herman Mers and that Pashley's representation of all appellants gave rise to an actual conflict of interest. Herman Mers admitted at trial that he was guilty of the acts charged, but argued that he had been entrapped by the government's informant. Lester Mers asserted a variant of the entrapment defense. Because he had no direct contact with the government's informant, he did not have the classical entrapment defense available to him. Nevertheless, he endeavored to claim entrapment under the theory that, since his father Herman was entrapped and as a son he had no choice but to help his father, he also was entrapped. Ferrante and Myers argued, by contrast, that they played no part whatever in the conspiracy, that they thought they were guarding a truck full of valuable antiques.

Ferrante and Myers contend on appeal that the presence of Herman Mers' entrapment defense and Lester Mers' hybrid agency theory/entrapment defense damaged the effectiveness of their own defenses. From an evidentiary and a psychological perspective, they argue, it was impossible for a single counsel credibly to argue all four cases, especially when all four defendants took the stand to tell their divergent stories. Ferrante and Myers further argue that counsel's divided loyalties resulted in a significantly greater emphasis on the defenses of the Mers. Finally, they urge that the desperate nature of the entrapment defense assured that all four defendants

would be jointly shot down as "birds of a feather." Similarly, Herman Mers argues that his entrapment defense was diluted and was prejudiced by the court's finding that Lester Mers could not avail himself of the entrapment defense.

Judge Evans found that, despite the disparity in defenses, counsel was not laboring under an actual conflict of interest:

It is true as an abstract proposition that inherent in establishing entrapment is the acknowledgement, albeit under pressure, of participation in an illegal objective. Raising entrapment as a defense for one coconspirator is thus a strategy which potentially conflicts with the assertion by others of lack of knowledge of the illegal activity. Defendants, however, have not given any indication that such conflict developed in the instant case. . . . They have given no indication of what other defense posture would have better served them in the context of a joint trial for conspiracy and of the Government's evidence that a truck which they, while armed, had been following was filled with 2,000 pounds of marijuana.

■ We agree that Pashley's representation of all four defendants did not create an actual conflict of interest. The defenses in this case were not antagonistic, much less mutually exclusive. Ferrante and Myers did not base their defense on the proposition that no conspiracy existed; rather they argued that *they* had no knowledge of any conspiracy. We have found "where codefendants' statements are largely corroborative, repetitive or serve the same purpose, there is no conflict." *United States v. Medel,* 592 F.2d at 1310. *Accord United States*

*v. Fannon,* 491 F.2d 129, 132 (5th Cir.), *cert. denied,* 419 U.S. 1012, 95 S.Ct. 332, 42 L.Ed.2d 286 (1974). Neither Ferrante nor Myers have shown that they stood "to gain significantly" by abandoning the common defense. *Foxworth,* 516 F.2d at 1076. On the contrary, Lester Mers bolstered Ferrante's and Myers' defense by corroborating their testimony that the latter thought they were guarding a truck full of antiques.[2] Further, the record suggests that the various defenses, while different, were coordinated. The testimony of the Mers could have greatly harmed Ferrante and Myers. Consistent with their own entrapment defenses, for example, the Mers could have devastated Ferrante's and Myers' defense by testifying that they had informed Ferrante and Myers that they were guarding marijuana and that the latter were fully aware of details of the transaction. By contrast, nothing in the record suggests that Ferrante and Myers could have offered damaging testimony against the Mers. DEA agents had taped several of the Mers' negotiations over the proposed marijuana transaction. Nothing to which Ferrante and Myers could have testified would have inculpated the Mers more than those taped admissions. Also, to have damaged the Mers, Ferrante and Myers would have had to inculpate themselves in the conspiracy. We find that these appellants' interests "are closely aligned such that their united front strategy might well have been the best strategy available." *United States v. Medel,* 592 F.2d at 1312.

No appellant has pointed to any different defense theory or new evidence or testimony that independent counsel could have elic-

2. Lester Mers testified as follows:

Q All right, and what did you ask him [Ferrante] to do?
A Well, I told him that I was in the middle of a transaction of an estate, of a house that had been sold in the neighborhood, and that there was some antiques and some furniture that I was responsible for to move, and I would appreciate it if he could help me out by following me with this truck to the bank where there would be a transaction of money for this deal and to give me a ride home after that.

Q Did you ever mention the word marijuana to him?
A No, I never did.
Q What did he say generally in response to your request?
A Well, he said it was sort of an inconvenience because he was going out of town, but if I couldn't get any help from anybody, then I should call him back, and I said I had already made as many calls as I could, and I couldn't find anybody.

ited. Rather, appellants contend that an actual conflict resulted because the responsibility of representing all defendants diluted Pashley's credibility before the jury. We decline to hold that these appellants have shown an actual conflict merely because separate counsel might have been more impressive to a jury. All appellants' defenses were fully and forcefully presented through their own testimony. Their entire defense depended upon whether the jury believed or disbelieved this testimony. Further, cross-examination of government witnesses was probing and thorough and closing argument highlighted the strengths of the various defenses. To argue that because, stylistically or psychologically, another attorney might have been more persuasive underestimates the jury's ability to evaluate the credibility of evidence.

Ferrante's and Myers' final conflict of interest argument is that Pashley's common defense denied them the opportunity to shift blame for the offense onto the Mers. They contend that independent counsel would have focused the jury's attention on the Mers by hammering home the point that the evidence against the Mers was far greater than against them. While a strategy of shifting blame to one's codefendants is a legitimate and often effective defense strategy, we conclude that in this case the independence of the defenses asserted precluded the possibility of shifting blame from one codefendant to another.[3]

In *Foxworth* the former fifth circuit held that a defendant's sixth amendment rights have been violated if the reviewing court perceives from the record a plausible alternative defense theory more favorable to the defendant than that actually pursued by counsel, but which would have prejudiced at least one codefendant by shifting to him more responsibility for the acts at issue. 516 F.2d at 1079. Although the record in *Foxworth* indicated that conflicting testimony at trial presented opportunities of shifting blame, the former fifth circuit pointed out that a conflict existed in selecting the initial strategy, which precluded counsel from adopting a tactic of shifting blame to one of the codefendants. *Id.* at 1079–80. The court held that "if the record shows that a plausible defense (one that might have influenced twelve reasonable jurors) was foreclosed because it might have prejudiced the other defendants represented by the same appointed counsel, the conviction must be overturned. . . . An alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is plausible." *Id.* (parentheses in original). The court stressed that "the conflict occurred not in presenting the defense chosen by appointed counsel, but in selecting defenses and strategies in the first place." *Id.* at 1079. The record in that case "amply established such a plausible defense." *Id.*[4]

The government contends that the fifth circuit in *Benavidez* effectively overruled the *Foxworth* holding that counsel's failure

---

**3.** The conflict claim asserted by appellants and its shifting the blame corollary are particularly troubling in conspiracy cases, where "the very nature of the charge suggests the desirability of disassociation." *Fryar v. United States,* 404 F.2d 1071, 1073 (10th Cir.1968), *cert. denied,* 395 U.S. 964, 89 S.Ct. 2109, 23 L.Ed.2d 175 (1969). In *Glasser* the Supreme Court noted the special risks of multiple representation when the charge is conspiracy: "In conspiracy cases, where the liberal rules of evidence and the wide latitude accorded the prosecution may, and sometimes do, operate unfairly against an individual defendant, it is especially important that he be given the benefit of the undivided assistance of his counsel . . . ." 315 U.S. at 76, 62 S.Ct. at 467–68. *See also* Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional*

*Responsibilities of the Defense Attorney,* 62 Minn.L.Rev. 119, 136 (1978); Dawson, *Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices,* 77 Mich.L.Rev. 1379, 1397–1448 (1979).

**4.** In *Foxworth* four prisoners were convicted of murdering a fifth. The four other prisoners in the cell testified for the prosecution; the defense's theory was that these four government witnesses had committed the murder. The government contended that the four defendants had an interest in presenting a united defense: they had a common interest in discrediting the prosecution's witnesses. Further, their own positions were compatible with the joint strategy.

to shift the blame among codefendants could constitute an actual conflict of interest. We cannot agree. Like Foxworth, each defendant in *Benavidez* contended that because the evidence against his codefendant was stronger than the evidence against him, his counsel should have adopted a strategy of shifting the blame to the codefendant and emphasizing the relative weakness of the case against himself; because trial counsel represented both defendants, he was not free to adopt such a strategy. Unlike *Foxworth,* however, the court in *Benavidez* stated that the appellant could "not point to any specific argument that counsel was precluded from making or to any specific evidence that counsel was precluded from adducing on his behalf, *and in reviewing the record we have discerned none.*" 664 F.2d at 1262 (emphasis added). Because appellant could offer no evidence or argument in support of a "plausible alternative strategy," *id.* at 1260, the court could not find an actual conflict of interest. *Accord United States v. Huntley,* 535 F.2d 1400, 1406 (5th Cir.1976), *cert. denied,* 430 U.S. 929, 97 S.Ct. 1548, 51 L.Ed.2d 773 (1977); *United States ex rel. Small v. Rundle,* 442 F.2d 235, 238 (3d Cir.1971).

▆ Far from overruling *Foxworth, Benavidez* does no more than reaffirm the requirement, strongly articulated in *Foxworth* itself, that an "alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is *plausible.*" *Foxworth,* 516 F.2d at 1080 (emphasis added). The synthesis of *Foxworth* and *Benavidez* is a specific application of the general principle that to warrant reversal, a conflict of interest must be actual rather than hypothetical. Failing to adopt a strategy of shifting blame may well give rise to an actual conflict of interest, but to do so the strategy must have been an option realistically available to trial counsel.

Like the defendants in *Benavidez,* these appellants are unable to show that a strategy of shifting the blame was really a plausible alternative for Pashley. In pronounced contrast to the situation in *Foxworth,* the various defenses presented by appellants at trial were the only defenses realistically available to them. Given the highly incriminating conversations tape recorded by the DEA, the Mers had little choice but to admit their indisputable actions and to focus their attack on the conduct of government agents. Likewise, Ferrante's and Myers' only defense was to admit their incontrovertable actions, but to claim that they had no knowledge that the substance in the truck was marijuana. The differences in the nature of the defenses and the compatibility of the various positions asserted precluded the possibility of counsel's adopting a strategy of shifting blame among codefendants. To decide that this case presents an actual conflict would be to impose "a *per se* rule requiring separate representation: every time a lawyer represents more than one defendant, he is precluded from 'shifting the blame' to the client against whom the government presents the stronger case." *Benavidez,* 664 F.2d at 1260.

(2)

Speedy Trial Act

▆ Herman and Lester Mers contend that their trial did not commence within the period required by the Speedy Trial Act. 18 U.S.C. §§ 3161–68. The Act mandates that defendants be brought to trial within seventy days "from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). The accounting of time under the Act is subject to excludable delay attributable to the defendant as well as other particularized delays set out in section 3161(h)(1). In the present case, we assume that the seventy day period began to run on March 2, 1981, the date on which appellants were arraigned. *See* note 6, *infra.* Trial commenced on August 5, 156 days after arraignment. The government argues the exclusion of a total of ninety-seven days covering three discrete periods: forty-one days (March 13 to April 22) for motions

practice before the magistrate, section 3161(h)(1)(F); twenty-six days (April 22 to May 18) during which the magistrate had the motions under advisement, § 3161(h)(1)(J); and thirty days (June 2 to July 1) during which the magistrate's report and recommendation was under advisement by the district court, § 3161(h)(1)(J).[5] We agree that the time was properly excludable.[6]

Appellants dispute two categories of exclusion. First, they argue that section 3161(c)(2), which provides that trial must commence "not less than thirty days from the date on which the defendant first appears through counsel," prohibits exclusion of any time occurring within that first thirty days following a defendant's first appearance. Appellants contend that otherwise excludable delay resulting from pretrial motions filed by defendants and pending within that thirty day period should not be deemed excludable. Of the total of forty-one days excluded time attributed to defense motions, eight days (March 13 to March 20) fell within the initial thirty day period covered by section 3161(c)(2). Appellants do not dispute the exclusion of other time within this forty-one day period.[7]

Appellants' position finds support in neither the language, legislative history nor policy of the provision. Section 3161(c)(2), added to the Act by Congress in 1979, by its terms speaks to the time during which trial may *not* commence absent waiver by a defendant of his speedy trial right. *See* Committee on the Administration of the Criminal Law of the Judicial Conference of the United States, Guidelines to the Administration of the Speedy Trial Act of 1974, As Amended 12–13 (1979) (hereinafter cited as Judicial Guidelines). The section is not addressed to the computation of the overall time period during which trial must commence. Even if this language is arguably ambiguous, the legislative history is not. The legislative history leaves no doubt that the purpose behind subsection (c)(2) was to prevent a trial from being held so quickly that a defendant would not have time to prepare. Section 3161(c)(2) was added to the statute at the behest of the Justice

**5.** The government also sought to exclude three days (August 2 to August 5) during which defense motions to dismiss the indictment based on Speedy Trial Act violations were pending before the district court, *see* 18 U.S.C. § 3161(h)(1)(F), and Herman Mers was unavailable for trial. *See id.* at § 3161(h)(3)(A). Appellants do not dispute this exclusion.

**6.** Appellants contend that the seventy day time period should begin not on March 2, 1981 (date of arraignment) but rather on February 18 (date of indictment). They base this contention on the fact that they appeared for a bond hearing before a judicial officer (a magistrate) on February 6, the day of their arrest. If a defendant has appeared before a judicial officer in connection with the charge prior to the filing of the indictment, then the speedy trial clock commences on the date the indictment was filed. *See* 18 U.S.C. § 3161(c)(1); Committee on the Administration of the Criminal Law of the Judicial Conference of the United States, Guidelines to the Administration of the Speedy Trial Act of 1974, As Amended 7–8 (1979). Although it is true that "[w]hen the defendant is arrested prior to indictment and makes an initial appearance before a magistrate who orders him held to answer the charges in the district court, the seventy-day period runs from the date of his indictment," *United States v. Haiges,* 688 F.2d 1273, 1274 (9th Cir.1982); *see also United*

States v. Carrasquillo, 667 F.2d 382, 384 (3d Cir.1981), we need not reach this issue. Even accepting appellants' contention that the clock should have begun on the date of indictment (February 18), that starting date adds only eleven days (February 18 to March 1) to the time that must be counted; March 2, the arraignment date, would be excluded under § 3161(h)(1) as a proceeding relating to defendants. Eleven days, added to the fifty-six net non-excludable time as we calculate it, equals sixty-seven days. See note 5, supra. Even with this earlier starting date, trial began within the requisite seventy days.

**7.** On March 13, defendants filed numerous pretrial motions. Three days later, a pretrial conference disposed of some but not all of the motions. On March 26, the date for which a suppression hearing was originally scheduled, the hearing was continued, at the request of appellants, until April 8. On April 8, appellants again requested and were granted a continuance; the same thing happened on April 15. On April 22, the magistrate concluded that no suppression hearing would be needed, based on the government's representation that it would not call its informant to testify at trial. Appellants challenge the excludability of only eight days of this time: March 13 to March 20.

Department, the Judicial Conference and the American Bar Association. *See* Misner, *The 1979 Amendments to the Speedy Trial Act: Death of the Planning Process,* 32 Hastings L.J. 635, 642–43 (1981). Assistant Attorney General Phillip Heymann testified before the Senate Committee on the Judiciary that "[i]t is in recognition of the special problems often faced by defense counsel that the Department has included a provision in its bill requiring a minimum of 30 days for defense preparation. This insures the defendant some minimum preparation time even in the simplest case."[8] *The Speedy Trial Act Amendments of 1979: Hearings Before the Senate Committee on the Judiciary on S. 961 and S. 1028,* 96th Cong. 1st Sess. 47, 53 (1979) (hereinafter cited as 1979 Senate Hearings), *excerpted in* Federal Judicial Center, Legislative History of Title I of the Speedy Trial Act of 1974, 70, 71 (1980) (hereinafter cited as Legislative History). *See also* S.Rep. No. 212, 96th Cong. 1st Sess. 31–32 (1979) (hereinafter cited as 1979 Senate Report), *excerpted in* Legislative History at 73 (explaining the purpose of the subsection as "guaranteeing the defendant a reasonable period in which to obtain counsel and prepare for trial"); 1979 Senate Hearings at 87, 91 (statement of Daniel Freed); *id.* at 115–17 (statement of Salvatore Martoche); Judicial Guidelines at 10 (the section "was added to the Act in 1979 to guarantee a minimum period of thirty days for the preparation of the defendant's case"); Misner, *supra* at 642–43

(observing that section 3161(c)(2) was an "apparent attempt to guarantee that the Act did not become the 'Speedy Convictions Act'" and that the "avowed reason for this amendment was to ensure that a defendant has adequate time for pretrial preparation"). *See also United States v. Horton,* 676 F.2d 1165, 1173 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1982) (Swygert, J., dissenting) (section 3161(c)(2) "recognizes that an accused generally needs thirty days to prepare his defense based on the charges detailed in his indictment"); *United States v. Wooten,* 688 F.2d 941, 951 (4th Cir.1982) ("what section 3161(c)(2) does is simply to guarantee to the criminal defendant the right to a delay of at least thirty days between arraignment and trial in any circumstances"). The 1979 Senate Report explicitly stated that the purpose of the subsection would be in no way furthered by holding that time that is otherwise excludable under the Act should not be excluded if it occurs within the first thirty days elapsing from the defendant's initial appearance:

Prohibiting trial less than 30 days after the date the defendant appears in a position to begin preparing his defense more fully protects basic due process rights. It is the Committee's intent that the exclusions provided in section 3161(h) apply to the 30-day minimum to-trial provision. Therefore, if an event occurs which would automatically exclude time under subsec-

---

**8.** Heymann specified:

Special emphasis should be made of the fact that the problems created by these strict time limits [in the 1974 act] apply at least equally to defense counsel as they do to prosecutors. In fact more often in these more complex cases, defense counsel needs are greater than ours because we have at a minimum prepared the case for presentation to the grand jury. In many of the more complex cases, especially in the white-collar crime area, we have spent considerably more time investigating the case. Sometimes the pre-indictment investigation can take years during which time the prosecutor has accumulated masses of documents on which he has spent a great deal of time and energy in review.

Equally serious problems arise for defense counsel in trying to rapidly become familiar with very esoteric federal laws or specific standard business practices and operating procedures. Often there is a need to become expert in the details of the particular regulations of a federal agency.

Defense counsel also has the particular problems, raised most often in multi-defendant cases, of potential conflicts in representation and difficulties in coordinating among the lawyers on the defense team. Each of these special problems is supported by the OIAJ study.

1979 Senate Hearings, *reprinted in* Legislative History at 71.

tion (h), such as a pretrial mental examination, that time is not only excluded from computing the time within which trial must occur prior to imposition of the dismissal sanctions, but *time would also automatically be excluded in computing the 30-day minimum period* of time, during which the judge could not schedule trial without the defendant's consent.

1979 Senate Report at 32, *excerpted in* Legislative History at 73–74 (emphasis added).

Appellants can cite only two authorities for their contention that no excludable delay is permitted during the first thirty day interval. The Judicial Guidelines at 12–14 provide that:

> In spite of language to the contrary . . ., it is the view of this Committee that the thirty-day minimum period for commencement of trial is not extended by the exclusions of Section 3161(h). . . . Moreover, if the thirty-day minimum were interpreted as subject to the exclusions, the provision would become a powerful weapon for defendants who wanted to delay their prosecutions, a result that is wholly at odds with the major purpose of the statute. Under such an interpretation, the court could be compelled to defer a trial simply because the defendant filed a motion or because the court took a pretrial matter under advisement—both events that trigger periods of excludable time under Section 3161(h)(1).

The fourth circuit, in *United States v. Wooten,* embraced the Guideline's passage quoted above and held that section 3161(c)(2) "does not provide for an extension of the 30-day minimum time period between the defendant's appearance with counsel and trial either expressly or by incorporation by reference of Section 3161(h)." 688 F.2d at 949–50. The *Wooten* court found that the

exclusions of section 3161(h) do not "apply" to the time limits of section 3161(c)(2): "There is no language in section 3161(h) which suggests even remotely that its exclusion provisions have any reference to or connection with the time limits fixed by section 3161(c)(2)." 688 F.2d at 950.

While a reading of the Judicial Guidelines and of *Wooten* supporting appellant's position appears superficially attractive, we believe that such an interpretation would misperceive the import of those sources. The thirty days of section 3161(c)(2) were intended to be measured as calendar days. The concern articulated by the Judicial Guidelines was that a defendant should not be able to lengthen his thirty day minimum period by the filing of motions that would constitute excludable time. The message of the quoted passage is that a clever defendant who wished to postpone indefinitely his trial should not be allowed to argue that certain pretrial motions filed within the first thirty day period tolled the running of the thirty day minimum period. Similarly, the *Wooten* court stated that "what the statute does not give the criminal defendant is the right, by filing dilatory motions, to extend on his own the date of his trial." 688 F.2d at 951. Thus, "what section 3161(c)(2) does is simply to guarantee to the criminal defendant the right to a delay of at least 30 days between arraignment and trial in any circumstances." *Id.* We conclude that section 3161(c)(2) merely defines the time during which trial may *not* commence and that that time is measured as thirty calendar days from the event triggering the speedy trial clock. We join other circuits that exclude time during the initial thirty day period. *See United States v. Stuart,* 689 F.2d 759, 762 & n. 2 (8th Cir. 1982); [9] *United States v. Jodoin,* 672 F.2d 232, at 236–38 (1st Cir.1982); [10] *United States v. Raineri,* 670 F.2d 702, 707–08 (7th

**9.** An information against Stuart was filed on June 22, 1981. 689 F.2d at 761. The court found that in "counting days elapsed before trial, we exclude the 16-day period from July 14, 1981, to July 30, 1981. The record on

appeal shows that the continuance granted during this time was to allow defendant to obtain counsel." *Id.* at 762 n. 2 (citation omitted).

**10.** Jodoin was arraigned on August 25, 1980. 672 F.2d at 236. The first circuit excluded two

Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982);[11] *United States v. Regilio,* 669 F.2d 1169, 1171–72 (7th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982);[12] *United States v. Brim,* 630 F.2d 1307, 1311–12 (8th Cir.1980), *cert. denied,* 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981).[13]

Appellants' second series of Speedy Trial Act arguments challenges the exclusion of certain time attributed to the magistrate's and the district court's disposition of pretrial motions. Appellants filed motions to suppress evidence on March 13, 1981, and the magistrate promptly set a hearing date. The date was postponed until April 22, because appellants obtained three continuances. *See* note 7 *supra.* The hearing did not occur on April 22, however, because the government informed the magistrate that it would not seek to introduce certain evidence. Because this decision by the government obviated the need for a suppression hearing, the magistrate orally informed the parties that he deemed all of the motions except one moot. On May 18, the magistrate issued his report and recommendation, in which he recommended that the district court dismiss as moot all motions save one. The magistrate deferred one of Herman Mers' motions to the district court judge for her consideration and gave the parties ten days to object before submitting his report to the court, as required by the Federal Magistrate's Act. 28 U.S.C. § 636(h)(1). No party objected and the report was submitted on June 2. The court adopted the magistrate's report on August 3. The forty-one days for motions practice (March 13 to April 22) were properly excluded under section 3161(h)(1)(F); this is not challenged. Although appellants raise creative arguments to the contrary, we hold that the twenty-six days during which the magistrate had the motions under advisement (April 22 to May 18) and thirty of the days during which the district court had the motions under advisement (June 2 to July 1) were excludable under section 3161(h)(1)(J).

Section 3161(h)(1)(J) provides for the exclusion of "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court."[14] Appellants dispute the exclusions on two grounds. First, they argue that section 3161(h)(1)(J) permits only a *total* of thirty days under advisement for both the magistrate *and* the district court. This is an issue of first impression. Although in *United States v. Delongchamps,* 679 F.2d 217, 219–20 (11th Cir.1982) we observed

periods falling within the first thirty days after arraignment. The court excluded ten days (August 25 to September 5) between the time when defense counsel made an oral motion for time to file a suppression motion and the time when the motion was actually filed. The court also excluded twenty-six days (from September 5 to September 30) when the motion to suppress was pending before the district court prior to hearing. *Id.* at 237.

11. Raineri was arraigned on June 23, 1980. 670 F.2d at 707. The court found that "the period from June 23 to August 1 does not count toward the seventy days because it was occupied with the prompt disposition of the motions the defendant filed on three different dates." *Id.* at 708.

12. Defendant was arraigned on August 15, 1980. 669 F.2d at 1171. On August 27, the defense initiated the motions practice exclusion by filing five pretrial discovery requests. *Id.* The court of appeals affirmed the district court's exclusion of eighty-one days between August 27, when the motions were filed, and November 17, when the order denying the motions was issued. *Id.* at 1172.

13. Brim was arraigned on October 16, 1979. 630 F.2d at 1311. The court held that from "October 23 until December 19 various pretrial motions were continuously pending. During that period the running of the seventy day limitation was tolled." *Id.* at 1313.

14. The section has as its predecessor § 3161(h)(1)(G) of the original 1974 Speedy Trial Act. The provision was "added by the Senate Judiciary Committee so that such exclusions would not have to be made under the 'ends of justice' continuance provision; the 30-day limitation was later added by the House." Frase, at The Speedy Trial Act of 1974, 43 U.Chi.L.Rev. 667, 693 (1976).

that section 3161(h)(1)(J) permits the magistrate a maximum of thirty days during which to take motions under advisement, *see also United States v. Raineri,* 670 F.2d at 707 (holding that section 3161(h)(1)(J) allows thirty day exclusion for magistrate having motions under advisement), this does not resolve the issue of whether the district court then may take an additional excludable thirty day under advisement period of its own for consideration of the same motion.

■ The magistrate spent a total of sixty-seven days dealing with the motions. Forty-one of those days (March 13 through April 22) were excludable as motions practice under section 3161(h)(1)(F). Appellants correctly argue that the excludable time under section 3161(h)(1)(F) ended on April 22, when the magistrate learned that a suppression hearing would not be necessary and when he orally advised the parties of the recommendations that he intended to make in his report and recommendation. The Judicial Guidelines at 33 recommend that the "exclusion for delay resulting from pretrial motions be treated as ending at such time as the court has received everything it expects from the parties before reaching a decision—that is, such date as all anticipated briefs have been filed and any necessary hearing has been completed. Thereafter, the matter should be treated as 'under advisement' and subject to the rules of subparagraph (J)." Section 3161(h)(1)(F) and section 3161(h)(1)(J) dovetail; the former ends when the latter begins. Thus the Judicial Guidelines at 42 recommend that the "under advisement period" of section 3161(h)(1)(J) begins on "the day following the date on which the court has received everything it expects from the parties, examining physicians, etc., before reaching a decision. It is normally the date following the expiration of an exclusion under subparagraph (A), (B), (F), or (G)." Once all parties' materials are in and any needed hearings are held (or it is determined that none are needed), the matter should be treated as "under advisement" and subject to section 3161(h)(1)(J) rather than section 3161(h)(1)(F).

The under advisement period was triggered on April 22, when the magistrate first learned from the parties that no suppression hearing would be required. As of that date, the magistrate had before him all of the materials he expected to receive from the parties. With April 22 as the starting date, the issue becomes whether the magistrate issued his report and recommendation within the thirty days permitted and whether the district court then is entitled to an additional thirty days during which to have the motions under advisement.

The magistrate submitted his report and recommendation on May 18. Appellants contend that he thus expended twenty-six days (from April 22 to May 18) of the thirty day total under advisement exclusion, thus leaving the district court a total of four days in which to dispose of the motions. We reject their argument that the thirty day under advisement exclusion is a total for both the magistrate and the district court. The Judicial Guidelines at 43 flatly state that "when a pretrial matter is considered by both a magistrate and a judge pursuant to [the Magistrates Act], the Committee believes that the [Speedy Trial Act] permits *two thirty day periods* for consideration of the same matter" (emphasis added). We agree with the Guidelines.

The third circuit adopted a similar approach in *United States v. Molt,* 631 F.2d 258 (3d Cir.1980). In *Molt,* the defendant was tried before several judges on different indictments. Two judges made decisions on pretrial motions, decisions which the government and the defense agreed were binding as to all of the indictments. One judge handled a suppression motion, while the second judge handled Molt's challenge to the constitutionality of the statute under which he was charged. On appeal, Molt argued that the Speedy Trial Act allowed only a total of thirty days "under advise-

ment" for both judges and both motions. In rejecting this contention, the third circuit stated:

> Such a narrow construction is not required by the language of the Act, nor is it consistent with the Act's intent. It is unlikely that a complex case like this, with motions affecting the disposition of multiple indictments being heard separately by different judges, was envisioned by the drafters. Although the Act is meant to speed prosecutions, it is not intended to ensnare trial judges. To allow only one exclusion would have that effect, for if only [one judge's] advisement period is excluded, then *no time* is allowed [the other judge]. First, this forces judges to race to decisions. Second, because one judge may not be aware of the action of the other, neither may even know that the time for consideration of the motion has been preempted by the other judge. A single judge hearing two motions is aware of the limits and can plan accordingly. Where two or more judges are hearing separate motions affecting a single case, each should have the same opportunity to bring his schedule into conformity with the Speedy Trial Act.

*Id.* at 261–62 (emphasis in original).

As a practical matter, allowing only a thirty day period within which both magistrate and judge can consider a motion might well unfairly limit full consideration of important and complex pretrial motions. The magistrate may need to review transcripts of evidentiary hearings and must review counsel's briefs before determining the outcome of a motion. He must then articulate, in writing, findings of fact and conclusions of law. After the magistrate files his report, the parties have ten days within which to file objections. 28 U.S.C. § 636(h)(1).[15] The district court then must conduct an independent review and dispose of the motion. We decline to adopt a mechanical rule that all of this must be accomplished within thirty days. Such a rule is not required by the Speedy Trial Act. Rather, we agree with the Judicial Guidelines that the magistrate and the district court have thirty days each during which to take pretrial motions under advisement. Here, the magistrate conducted the suppression hearing on April 22 and issued his report and recommendation on May 18. That span of twenty-six days during which he had the motions under advisement was less than the thirty to which he was entitled.[16]

▮ Appellants' second ground for arguing that the district court was not entitled to a thirty day under advisement period is that, because they had not objected to the magistrate's report and recommendation, there was nothing for the district court to take under advisement. They base this argument in part on a local rule of court which provides that absent objection a magistrate's report and recommendation becomes the order of the court. The magistrate's report, however, cannot automatically become the order of the court merely because none of the parties object.[17] The appellants' argument misunderstands the

---

**15.** We need not decide whether this ten days may properly be excluded under other sections of the Speedy Trial Act.

**16.** We do not wish to suggest that magistrates and district courts should, as a matter of course, routinely take motions under advisement for the maximum permissible period:

> The designation of magistrates to hear pretrial matters should not become a justification for prolonging the pretrial stage. Magistrates should normally be expected to render their determinations, proposed findings, and recommendations sufficiently promptly so

that the judge has adequate time to consider the matter without causing the total time a matter is "under advisement" to exceed thirty days. A district judge referring a matter to a magistrate should continue to maintain control over the case during the period of consideration by the magistrate, so that the purposes of the act will be accomplished. Judicial Guidelines at 42.

**17.** The record suggests that the operation of the local rule is far from automatic:

> MR. PASHLEY: I would point out that that particular report which was an order and a

role of the magistrate under the Federal Magistrates Act. Magistrates are not Article III judges; their jurisdiction is derived from the Magistrate's Act. That Act provides that a federal judge may reject, in whole or in part, the findings of the magistrate. 28 U.S.C. § 636(b)(1). The statute does not limit the court's power to reject only those reports to which objections are made, and no local rule may alter a district court's scope of jurisdiction.

Regardless of the likelihood that a court will accept or reject a particular magistrate's report, the court's *power* to do so cannot be questioned. In the present case, the district judge had to rule on the motions. For example, the court might well have remanded to the magistrate with instructions to determine whether a fourth amendment violation (alleged by appellants) may have indirectly resulted in tainted evidence that ought not be admitted into evidence. Further, one pretrial motion was not moot; the magistrate deferred this motion to the district judge for consideration. The court could have required a hearing on that motion.

The district judge, in her order denying appellants' motion to dismiss for failure to comply with the Speedy Trial Act, stated unmistakably that "during this period of time [between submission of the magistrate's report and recommendation and the court's adoption of the report] the Magistrate's Report was under advisement. Thirty days of this period is excluded in computing the time within which the trial must commence. See 18 U.S.C. § 3161(h)(1)(J)." The legitimacy of the thirty day exclusion is in no way negated by the fact that the court did eventually adopt the recommendations of the magistrate. The district judge had several motions to review and resolve,

and we decline to inquire whether that process should have taken her the full thirty days. *See* Frase, The Speedy Trial Act of 1974, 43 U.Chi.L.Rev. 667, 694 (1976) ("the judge himself will determine whether the period of delay meets this definition and there is nothing to prevent judges from routinely taking all motions 'under advisement' for the maximum of 30 days").

▆▆▆▆ Appellants stress the statutory language of section 3161(h)(1)(J) that the court must have the pretrial motions "*actually* under advisement" before the time is deemed excludable. From this language they argue that unless the district judge can demonstrate that she was actually reviewing a particular matter and can show the precise amount of time she spent on this review, then the time is not excludable; to be excludable under section 3161(h)(1)(J), the time must be reasonably attributable to the decisionmaking process. Such an approach would require appellate courts to evaluate the relative merit of pretrial motions to determine how much "advisement" was appropriate by the district court. Appellants apparently would require the district court to keep a daily log to keep account of the amount of time spent on each pretrial motion. We cannot read this much into the words "actually under advisement." While the section does require that the under advisement period be reasonable, we leave determination of the reasonableness issue to the sound discretion of the trial judge.

The section cannot mean that the district judge must demonstrate that she was actually considering the matter on every excludable day. Rather, the provision envisions excludable time as being that time, prior to disposition, during which the court has the matter under advisement or thirty days,

report became the order of the Court because there were no objections filed thereto. In other words, if a [report and recommendation] from the magistrate is, in fact, sent on to the Court and there are no objections thereto, the local rule is it becomes the order of the Court within 10 days.

THE COURT: Not necessarily. I suppose more often than not I do adopt the magistrate's report, but I have on occasion not adopted one even when there has been no objection to it.

whichever is less. Thus, if a court renders its decision on the tenth day after its submission, then the matter is deemed under "actual advisement" for ten days and the court can only exclude ten days, not thirty days. The thirty day under advisement exclusion, like the other exclusions in section 3161, is automatic. *United States v. Stafford,* 697 F.2d 1368, 1371–72 (11th Cir.1983). The Senate Judiciary Committee's Report recommended that the 1979 amendments "leave intact" the "automatic application of exclusions as provided in existing law." Specifically, the Report noted that section 3161(h)(1) "currently provides that periods of delay consumed by the following are to be automatically excluded: ... Periods when [hearings on pretrial motions] are under advisement by the court." 1979 Senate Report at 33, *excerpted in* Legislative History at 113–14. *Accord Stafford,* 697 F.2d at 1371–72 (concluding that the language of Section 3161(h) "clearly indicates" that each excludable period listed in the section "automatically is a period of delay" and "holding that Section 3161(h) creates automatic exclusion ..."); *United States v. Fogarty,* 692 F.2d 542, 545 (8th Cir.1982) ("[s]ection 3161(h)(1)(F) clearly requires automatic exclusion of the sixty-one days during which such pretrial motions were continuously pending"); *United States v. Brim,* 630 F.2d at 1312–13 (adopting the district court's conclusion that "the Act intended automatic exclusion"). *But see* S.Rep. No. 1021, 93d Cong. 2d Sess. 36 (1974), *excerpted in* Legislative History at 104.[18] For the Act to work, the parties must know, as each day passes, whether or not that day is excludable. We must "insure the ability of the courts to administer the Act." *United States v. Bufalino,* 683 F.2d 639, 646 (2d Cir.1982), *petition for cert. filed,* —— U.S. ——, 103 S.Ct. 727, 74 L.Ed.2d 952 (1982). To hold that an appellate court must examine retroactively the amount of "advisement" needed for a given pretrial motion would inject a dangerous element of uncertainty into the statutory scheme. *Accord Stafford,* 697 F.2d at 1371.

According to our calculations, appellants were brought to trial within the seventy days net time allowed by the Speedy Trial Act. Trial began 156 days after arraignment. Ninety-seven days were properly excluded: forty-one days for pretrial motions practice (including eight days falling within the initial thirty day period following arraignment), twenty-six days during which the magistrate had the motions under advisement and thirty days during which the district court had the motions under advisement.

### (3)

### Other Arguments on Appeal

■ Appellants raise several issues which need not detain us long. First, we find that the district court did not violate either Federal Rule of Evidence 801(d)(2)(E) or *United States v. James,* 590

---

**18.** It was not the intent of the Committee in adopting this amendment to give a blanket exception to matters under advisement for the time excluded must be "reasonably attributable" and the matter must be "actually under advisement." Therefore the judge must be actually considering the question, for example, conducting the research on a novel legal question.

S.Rep. No. 1021, 93d Cong. 2d Sess. 36 (1974) *excerpted in* Legislative History at 104. Similarly, in 1979, the Senate Judiciary Committee noted:

Although some witnesses contended that all time consumed by motions practice, from preparation through their disposition, should be excluded, the Committee finds that approach unreasonable. This is primarily because, in routine cases, preparation time should not be excluded where the questions of law are not novel and the issues of fact simple. However, the Committee would permit through its amendments to subsection (h)(8)(B) reasonable preparation time for pretrial motions in cases presenting novel questions of law or complex facts. We suggest caution by courts in granting "ends of justice" continuances pursuant to this section, primarily because it will be quite difficult to determine a point at which preparation actually begins.

1979 Senate Report at 33–34, *excerpted in* Legislative History at 114.

F.2d 575 (5th Cir.), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), in admitting into evidence certain statements made by coconspirator Lester Mers. The government met the *James* requirement that such statements are admissible only if there is "substantial independent evidence" of a conspiracy. *Id.* at 581 (emphasis omitted). Our earlier recitation of the facts shows that Ferrante and Myers were acting in concert with Lester Mers. Ferrante and Myers, who were both armed at the time, monitored the transfer of the marijuana-laden truck from Lester Mers to the undercover DEA agents; they began following the truck until Lester Mers ordered them to follow him instead; they then complied with Mers' directive and followed him to the restaurant where Herman Mers was waiting. Similarly, this evidence, combined with other testimony by DEA agents, was sufficient to support Ferrante's and Myers' convictions for conspiracy and aiding and abetting.

■ Secondly, the trial court did not abuse its discretion in denying Lester Mers a jury instruction on the entrapment defense. A defendant cannot avail himself of an entrapment defense unless the initiator of *his* criminal activity is acting as an agent of the government. *United States v. Noll,* 600 F.2d 1123, 1129 (5th Cir.1979); *United States v. Garcia,* 546 F.2d 613, 615 (5th Cir.), *cert. denied,* 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810 (1977). Lester Mers never dealt with or even met Fiori, the government's informant. Any inducements to Lester Mers to traffic in drugs came from Herman Mers, a private citizen. While Lester Mers' vicarious entrapment theory is ingenious, it is not the law.

■ Thirdly, Lester Mers argues that when the government arranges to provide the drugs to a subject and also arranges for another government agent to purchase the drugs, then the government has achieved a "full circle" transaction that violates a defendant's due process rights. The facts of this case, however, do not suggest a full-circle transaction. The defendants stipulated at trial that no DEA agent supplied marijuana to Fiori or to the Mers. There also was no evidence that Fiori supplied the marijuana.

■ Fourthly, Herman and Lester Mers argue that their due process rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) were violated by the government's refusal to disclose Fiori's arrest record and withholding of material relating to the existence of any remunerative agreement between Fiori and the government. Defendants offered no theory of how such material could have been relevant, admissible evidence. Because Fiori was not called as a witness, appellants' arguments based on Federal Rules of Evidence 608, 609 and 404(b) are inapposite.

AFFIRMED.