[Cite as *State v. Elmore*, 2014-Ohio-3674.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W Scott Gwin, P.J. |
|  | : | Hon. Sheila G. Farmer, J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 13-CA-84 |
| PHILLIP L. ELMORE | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Criminal appeal from the Licking County
                                                         Court of Common Pleas, Case No. 02-CR-
                                                         275

JUDGMENT:                                       Affirmed


DATE OF JUDGMENT ENTRY:          August 22, 2014

APPEARANCES:

For Plaintiff-Appellee                        For Defendant-Appellant

KENNETH OSWALT                          WILLIAM LAZAROW
Licking County Prosecutor                400 S. Fifth Street, Ste. 301
20 S. Second Street Fourth Fl.         Columbus, OH 43215
Newark, OH 43055

RANDALL L. PORTER                       KATHLEEN MCGARRY
Assistant State Public Defender         Box 310
250 East Broad Street, Ste. 1400      Glorieta, New Mexico 87535
Columbus, OH 43215-0708

*Gwin, P.J.*

{¶1} Defendant-appellant Phillip L. Elmore appeals the August 30, 2013 Judgment Entry of the Licking County Court of Common Pleas denying his motion for new trial after an evidentiary hearing. Plaintiff-appellee is the State of Ohio.

*Facts and Procedural History*

{¶2} On June 1, 2002, 47-year-old Pamela Annarino attended her son's wedding ceremony and reception. While Annarino was attending these activities, Elmore broke into her Newark home and waited for her to return. Elmore and Annarino had previously had a personal relationship.

{¶3} After she arrived home, Elmore murdered Annarino by strangling her and hitting her in the head with a pipe. Elmore then stole Annarino's purse and fled in her car. Subsequently, Elmore was convicted of the aggravated murder of Annarino and sentenced to death. Among the seventeen propositions of law raised by Elmore on his direct appeal, two concerned ineffective assistance of trial counsel. Proposition of law XIII concerned counsel's closing argument; in proposition of law X, Elmore argues that his counsel provided ineffective assistance during the penalty phase. The Ohio Supreme Court affirmed Elmore's conviction and death sentence. *State v. Elmore,* 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547. [Hereinafter "*Elmore I"].*

{¶4} Elmore filed his petition for post-conviction relief on August 26, 2004. The petition raised seventeen grounds for relief supported by 50 exhibits numbering 673 pages in length. On September 30, 2004, Elmore amended his petition for post-conviction relief by adding two additional grounds for relief and two additional exhibits. *State v. Elmore,* 5th Dist. Licking No. 2005-CA-32, 2005-Ohio-5940, ¶7. [Hereinafter

*"Elmore II"].* Elmore raised numerous claims alleging ineffective assistance of trial counsel. *Elmore II*, ¶33; ¶39; ¶42; ¶53; ¶64; ¶74; ¶76; ¶99; ¶108; ¶117; and ¶126. This Court overruled each assignment of error and affirmed the trial court's denial of Elmore's petition for post-conviction relief. The Ohio Supreme Court decline to accept Elmore's appeal. *State v. Elmore,* 111 Ohio St.3d 1492, 2006-Ohio-61712, 857 N.E.2d 1230.

{¶5} Elmore proceeded to file a Petition for Writ of Habeas by a Person in State Custody, 28 U.S.C. 2254. *Elmore v. Bobby,* S.D.Ohio No. 1:07-cv-776, 2012 WL 4057245(Sept. 14, 2012).

{¶6} On August 3, 2011, Elmore filed a Motion for Leave to File a Motion for New Trial Based on Newly Discovered Evidence ("Motion for Leave"). Elmore's Motion for Leave was based on information he obtained in his federal habeas corpus litigation. The gravamen of Elmore's claim is that his trial attorney Andrew Sanderson convinced Elmore to reject a plea offer that he had previously agreed to and would have saved his life, solely because Sanderson needed to participate in two capital jury trials to qualify for first-chair status under Rule 20 of the Ohio Rules of Superintendence. *Elmore v. Bobby,* *1.

{¶7} On October 6, 2011, upon the agreement of the parties, the trial court stayed the proceedings on Elmore's Motion for Leave pending decisions from the United States Supreme Court in *Lafler v. Cooper,* __ U.S.__, 131 S.Ct. 1376, 182 L.Ed.2d 398(Oct. 21, 2012) ["*Hereinafter Lafler"]* and *Missouri v Frye*, __ U.S.__, 132 S.Ct. 1399, 182 L.Ed.2d 379 (Mar. 21, 2012) [Hereinafter "*Frye*"]. The stay was lifted after those decisions were issued on March 21, 2012.

{¶8} On July 19, 2012, the trial court granted Elmore's Motion for Leave to File a Motion for New Trial and scheduled an evidentiary hearing on the Motion for New Trial. The evidentiary hearing occurred on February 19-20, 2013. Thereafter, the Court granted the parties an opportunity to submit post-hearing briefs. The following facts were established at the evidentiary hearing on Elmore's motion for a new trial and adopted by the trial court in its August 30, 2013, Judgment Entry overruling Elmore's motion.

**A. The trial phase of Elmore's case.**

{¶9} Because this was a capital case, the trial court appointed two attorneys to represent Elmore as required by Rule 20 of the Ohio Rules of Superintendence. J. Michael King was appointed as lead counsel and Andrew Sanderson was appointed as co-counsel. At the time, Sanderson had been certified as capital trial co-counsel, but not as lead counsel under Rule 20. The only requirement Sanderson needed to obtain in order to become lead counsel certified was to participate as co-counsel in two capital jury trials. King and Sanderson were appointed by the trial court on June 20, 2002, and June 21, 2002, respectively.

{¶10} Elmore did not have a strong case. Evidence of his guilt was overwhelming, and the victim died a gruesome death. After a series of pre-trial conferences, the resolution of a motion to suppress evidence in the state's favor, and informal inquiries about the possibility of a negotiated plea, the lead prosecutor extended a plea offer to Elmore's lead counsel. In a letter dated January 22, 2003, the state offered life without parole on count one (aggravated murder) and [the state] "would

agree not to seek the death penalty" [Def's Ex. 5]. In addition, the state would seek maximum consecutive sentences on the remaining counts.

{¶11} On February 3, 2003, King met with Elmore at the Licking County Justice Center to discuss the offer. Sanderson was unable to attend this meeting. At the conclusion of that meeting, Elmore indicated that he wished to accept the offer and indicated his desire to do so by writing on the bottom of that letter. "O K  2-3-03 /s/ *Phillip Elmore"* [Def's Ex 5]. After this meeting, King advised the trial court that Elmore had accepted the state's offer and the case was scheduled for a change of plea and sentencing hearing before a three judge panel on February 13, 2003. Judge Jon R. Spahr[1] presided over Elmore's trial. (2T. at 316).[2] The two other judges would have been Judge Gregory Frost and Judge Robert Hoover. (2T. at 329). A three-judge panel was necessary because this was a capital case. (1T. at 165).

{¶12} When King arrived at court that morning, he met Sanderson who had just spoken to Elmore. Sanderson told King that there was a problem with the case and that Elmore no longer wished to accept the plea offer. King then spoke with Elmore and confirmed that he did not wish to proceed with the plea.

{¶13} On March 31, 2013, King filed a motion to withdraw from the case, which was granted the same day On April 26, 2003, Brian Rigg was appointed lead counsel as King's replacement.

{¶14} Throughout the next several months, Rigg and Sanderson prepared Elmore's case for trial. However, at various times, both Rigg and Sanderson approached Elmore about negotiating a plea agreement.

---

[1] Judge Spahr retired in 2009.
[2] References to the transcript are to the Hearing on Elmore's Motion for a New Trial, February 19, 2013 ["1T."] and February 20, 2013 ["2T."], unless otherwise noted.

{¶15} Sanderson wrote Elmore on March 11, 2003, outlining the steps he would take to reinitiate plea discussions if that was Elmore's desire. According to Rigg, at times Elmore may have been close to reconsidering a life term if the prosecutor agreed, but in the end Elmore would not agree to a sentence that did not have at least the possibility of him becoming eligible for parole.

{¶16} Elmore's case eventually proceeded to trial. During the mitigation phase, Elmore gave an unsworn statement to the jury during which he stated, "I'm truly sorry for what I have done. But I feel that I deserve the worst punishment that there is. That's one thing I agree with the prosecutor." After the mitigation hearing, the jury recommended death and the Court sentenced him to death.

## B. Newly Discovered Evidence.

{¶17} Elmore's Motion for New Trial is based on evidence that came to light in early 2011 during his federal habeas corpus litigation. Elmore's attorneys took the deposition of the attorneys involved in Elmore's trial, including Shanda Behrens, a former associate of Sanderson's.

{¶18} During Behrens deposition, she alleged that Sanderson felt compelled to persuade Elmore to reject the plea offer of life without parole because Sanderson needed the case to go to trial in order to become eligible for lead counsel certification under Rule 20.

{¶19} Elmore's defense team also obtained an affidavit from Leigh Bayer, another former associate of Sanderson's, who assisted in the trial of a second capital case about a year after Elmore's. Bayer made similar allegations, i. e., that Sanderson

was obsessed with having the case go to trial in order to complete his requirements to obtain lead counsel certification.

{¶20} In light of these allegations, the court scheduled an evidentiary hearing on Elmore's Motion for New Trial This hearing occurred on February 19 - 20, 2013.

### C. Hearing on Motion for New Trial.

*1. Shanda Behrens – Law Clerk/Associate Attorney*

{¶21} Elmore's claim that Sanderson had a conflict of interest rests primarily on the testimony of Shanda Behrens. Behrens was working as an intern in Sanderson's office in June 2002, when Sanderson was appointed to represent Elmore. At the time, she had just graduated law school, sat for the bar exam, and was waiting on her results. She became licensed to practice law in November 2002, and continued to work there as an attorney. One of Behrens' assignments during that period was to assist Sanderson on the Elmore case. Typically, her duties included visiting Elmore at the jail and speaking with members of his family. She also provided other assistance in preparation for trial.

{¶22} In early 2003, Behrens learned that the prosecutor's office extended a plea offer to Elmore. After King received the written offer, both he and Sanderson were supposed to visit Elmore to discuss the offer. Sanderson was not able to attend so King met with Elmore alone. After the meeting, King advised Sanderson that Elmore indicated he would accept the offer. Behrens testified that after Sanderson became aware that Elmore had accepted the plea offer, Sanderson indicated that he wanted Elmore's case to go to trial. Specifically, she stated that Sanderson,

[W]anted to be eligible for his first chair certification and indicated that this would have been his first trial. You have to have two trials to get — to apply for your first chair certification and that he needed to have this trial in order to get on the road to doing that. [2T. at 207].

{¶23} Behrens testified that Sanderson was preoccupied with his desire to become lead counsel eligible under Rule 20 and that he mentioned it several times,

It was an ongoing discussion. We talked about the case all the time, of course I specifically recall him say to me, I need Mr. Elmore to have a trial in this matter. I need my first chair certification. [2T. at 209].

{¶24} However, Behren acknowledged that she never heard Sanderson talk Elmore out of the plea offer or even advise Elmore that he should proceed to trial in any of the conferences she attended between Sanderson and Elmore. She acknowledged that her primary function during her meetings with Elmore was to act as a liaison between Elmore and Sanderson and that most of her involvement in the case consisted of meeting with Elmore a few of times a week. She also acknowledged that Elmore might have indicated that he did not have anything to lose by going to trial, because he would die in prison anyway and that "if they want to kill me, I might as well have a trial" [2T. at 218-219].

*2. Andrew Sanderson - Elmore's trial co-counsel.*

{¶25} Sanderson testified that Elmore had consistently refused to consider pleading to anything that would result in a life sentence without the possibility of parole, (1T. at 79). Sanderson could not recall meeting with Elmore after he learned Elmore would take the offer, but according to Sanderson's billing records, Sanderson met with

Elmore briefly on January 31, 2003, after the date the written offer was extended to King, but before, Elmore agreed to plead on February 3, 2003. Sanderson also acknowledged that his billing records showed he met with Elmore alone on February 11, 2003, after Elmore said he would accept the offer, but before the scheduled court date of February 13, 2003.

{¶26} After Elmore refused to plead on February 13, 2003, Sanderson testified that Elmore claimed that he accepted the offer to "get King off his back "[1T. at 80-81]. Sanderson did not dispute that he may have told Behrens he hoped the case went to trial. He testified that he enjoyed trial work. However, he claimed that he never talked Elmore out of the plea,

Q.      If Ms.  Behrens were to come to court and say that you were interested in Mr. Elmore's case going to trial, would you have any reason to dispute that?

A.      Not a one.

Q.      And if Ms. Behrens were to come to court and say that you were interested in Mr. Elmore's case going to trial because it would ultimately lead to your first chair certification, would you have any reason to contest that?

A.      No, but it presents it in a vacuum.

Q.      Okay Would you — do you ever recall telling Ms. Behrens that you needed to talk Mr. Elmore out of pleading so that you could have the trial?

A.      I would never have said that to her.

1T. at 98. Sanderson further testified,

Q.      On February 13, 2003, the day on which the three judge panel hearing was set, you and Michael King and Phillip Elmore met privately in Judge Spahr's jury room. Is that correct?

A.      I believe so, yes.

Q.      At that time, Phillip Elmore made the decision not to accept the state's proposed resolution. Is that correct?

A.      I would assume so, yes.

Q.      At that time, you did not make Phillip Elmore reject the State's proposed resolution, did you?

A.      No, I did not.

* * *

Q.      If Elmore gave you the authorization, you would have attempted to convince the prosecutor to return to the original deal, the life in prison, back on the table, correct?

A.      I would have, and I have every expectation I could have gotten it back on the table.

Q.      At no point thereafter did Elmore give you authorization to ask the prosecutor to reinstate the life without parole recommendation, correct?

A.      Not that I recall.

1T. at 107-108. On March 11, 2003, Sanderson wrote a letter to Elmore stating,

I am writing in response to your letter, received by my office today, March 7, 2003[3]. Needless to say, I was disappointed in your words, thoughts and emotions. I am sorry you have reached this decision, but, as

---

[3] Elmore's March 7, 2003 has not been recovered.

I have told you in the past, I would respect the same and do what I could to bring your desires to fruition. That being said, I am unclear from your letter what it is exactly you want me to try and accomplish. You expressed in your letter that you wished to plead guilty to "all counts," but did not elaborate on what you meant by that. Do you want me to try and convince the prosecutor to return the original deal, the life in prison, back to the table or are you representing that it is your desire to plead to all counts even if the specification is included and, in doing so, waive mitigation, effectively pleading to the death sentence?

\* \* \*

I have contacted the prosecutor's office and provided them with a preliminary indication of your renewed desire to plead, but need more information from you before I may fully pursue this matter and attempt to carry out your wishes.

*3. J. Michael King – Elmore's Lead Counsel.*

**{¶27}** J. Michael King indicated that on June 20, 2002, Judge Jon Spahr appointed him "lead counsel" pursuant to Rule 20, Rules of Superintendence for the Courts of Ohio, on Phillip Elmore's capital case.

**{¶28}** King indicated that as a general rule Licking County does not engage in plea bargaining. (1T. at 127). Although he has no specific recollection, King was sure that either he or Sanderson nevertheless approached the prosecutor about a possible plea.

{¶29} King received a letter dated January 22, 2003 from Assistant Prosecutor Glenn Rossi offering a resolution. Pursuant to the agreement, Elmore would have pled guilty before a three-judge panel to all charges. The state was offering life without parole on the aggravated murder charge and the state would agree not to seek the death penalty. The state further offered the maximum consecutive sentences on all other charges. The offer was expressly made contingent upon the acceptance of the terms by the trial court.

{¶30} King conveyed the offer to Sanderson, who at King's request was able to get an extension of the cut-off date. (1T. at 132-33). Although King and Sanderson originally planned to visit Elmore together, King ultimately met with Elmore alone after receiving a phone message that Sanderson had gotten tied up in court. King conveyed this offer to Elmore who accepted the agreement, initialing and dating the written offer from the prosecutor to confirm his assent. The case was then set for a hearing before a three-judge panel at which time Elmore was to enter his guilty plea.

{¶31} The morning of the hearing, King was met in the hall outside the courtroom by his co-counsel, Andrew Sanderson. (1 T. at 142). Sanderson informed King that Elmore had changed his mind, and would no longer accept the plea offer. King and Sanderson then met privately with Elmore in Judge Spahr's jury room. King testified,

> Q.    During this private conference with Elmore, you asked Elmore if he
> had changed his mind about the proposed resolution. Is that correct?
>
> A.    Yes.

Q.      In response, Elmore acknowledged that he changed his mind. Is that correct?

A.      Yes.

Q.      Andrew Sanderson did not impair or restrict your dialogue with Elmore. Is that correct?

A.      At that point, yeah. He didn't. I don't recall Andrew saying anything at that point in time.

Q.      When you asked questions of Elmore, Elmore gave his own responses. Is that correct?

A.      Yes.

* * *

Q.      You reminded Elmore that if his decision was to reject the proposed resolution, you would withdraw from the case. Is that correct?

A.      Correct.

Q.      You were satisfied that Elmore was cogent and lucid. Is that correct?

A.      Yeah, didn't have any question about that.

Q.      Even though you disagreed with Elmore's decision, you were satisfied that Elmore did not misunderstand the options before him. Is that correct?

A.      He should have. I mean, I don't know what he understands, but we certainly explained the various penalties and options to him throughout this—certainly throughout my representation of him.

Q.      Were you then—were you then satisfied that Elmore did not misunderstand the options before him?

A.      It was my belief that my client at that time knew what the penalties were and what his options were.

Q.      Even though you disagreed with Elmore's decision, you were satisfied that Elmore himself did not want to go through with the proposed deal. Is that correct?

A.      Correct.

1T. at 148-149.

*4. Brian Rigg – Successor Lead Counsel*

{¶32}   Brian Rigg testified that he was appointed lead counsel in Phillip Elmore's capital case on April 15, 2003 after Elmore withdrew his guilty plea and former lead counsel J. Michael King filed a motion to withdraw from the case. Rigg testified that because of the death specifications a plea before a single judge was not possible. [1T. at 165] A three-judge panel would be convened. At the time of Elmore's trial, in a plea proceeding before a three-judge panel the state remained obligated to show the three-judge panel there was sufficient evidence to justify a guilty plea to aggravated murder and the death penalty specifications. [Id.] The defense would be required to present mitigation evidence. [1T. at 166] The ultimate sentence would be determined by the three-judge panel who would not be bound to follow any recommendation the state may have made. [1T. at 166-167] Rigg further testified,

Q.      In fact, a couple weeks before the trial started, just a few weeks before the trial started, Elmore gave you reason to believe that he

was seriously considering taking a plea to resolve the case short of trial. Isn't that correct?

* * *

A.      Yes. I thought up until – yeah, maybe a few weeks before trial that we were getting close to maybe a plea.

Q.      In fact,  Elmore told you after he – he would need to talk to his family by telephone and that he would let you know whether he was going to take that plea or at least give you authorization to approach the State. Is that correct?

A.      Yes, I remember that conversation, because his family lived out of state.

Q.      Now according to your deposition, a couple weeks before the trial started, you were, quote, a little bit taken aback that Elmore wanted to go forward with the trial, because you thought it was going to be a plea. Is that correct?

A.      Yeah, I thought we were getting close to –Mr. Elmore was getting close to wanting to take a plea, yes.

Q.      But it was Elmore's decision to, ultimately, reject that plea even shortly before the trial—even the idea of approaching the State?

A.      It was his decision, yes.

* * *

Q.    And in all you-although you may have disagreed with Elmore's decision, you were of the belief Elmore was competent to make that decision. Isn't that correct?

A.    Yes.

Q.    And if you thought Elmore was not competent to make that decision, you would advise Judge Spahr. Is that correct?

A.    Yes

* * *

Now if you thought Elmore was getting advice not to take a plea offer, do you believe Elmore would have told you that?

A.    Yeah, I'd hope so. Yeah.

Q.    And he never told you that, did he?

A. Mr. Elmore, no.

1T. at 169-172.

*5. Kenneth Oswalt - Trial Prosecutor.*

**{¶33}** Kenneth Oswalt testified that he was involved in almost all of the pretrial proceedings in Elmore's case, but was not one of the trial prosecutors because he had a conflict that week. Bob Becker, the elected prosecutor at the time of Elmore's trial, and Assistant Prosecutor Glenn Rossi, represented the State of Ohio at Elmore's jury trial.

**{¶34}** Oswalt further testified that the policy of the Licking County Prosecutor's Office not to initiate plea negotiations in criminal cases. (2T. at 246-48). If the defense team indicates that a defendant is amenable to accepting a negotiated plea, the Prosecutor's Office will consider a possible plea. In a capital case, the Prosecutor's

Office needs to talk to the victim's family before agreeing to a negotiated plea. Oswalt described the state's proposed resolution in Elmore's case,

> It means that if you enter a plea to everything in this indictment including a specification -- actually four specifications any one of which technically makes you eligible for the death penalty, we would go on record and not -- and although it's not specifically spoken in here, represent to the Court not only are we not seeking the death penalty, that we are okay with life without parole, we represent that's also the position held by the victim's family if he pleads guilty. Okay? That is we are no longer insisting upon the death penalty if he pleads guilty, accepts responsibility, we'll be completely - accept because we get closure, we being the government, but more so the family, we get closure; we get a defendant acknowledging his guilt.

1T. at 172. Oswalt then explained what steps would occur after the plea,

> Q.      If Elmore would plead guilty to all the charges, who would make the final decision about the sentence, the prosecutor's office or the three judge panel?
>
> A.      Three judge panel.
>
> Q.      Why would that be?
>
> A.      Because as any plea agreement case, plea bargained case, the judge always has -- the Court always has the ability to say, "No, I'm not bound by it," and here we had three judges, so we had a situation where three judges ultimately would be called upon to decide whether

they would accept a recommendation presupposing they accepted the plea. If Mr. Elmore came in and waffled about what he wanted to do and ambivalent, the Court may have said, "I'm not even taking the plea," and we wouldn't have gotten to sentencing issue.

Q.      If Elmore would plead guilty to all the charges and the prosecutor's office agreed not to seek the death penalty, would it still be legally possible for Elmore to be sentenced to death by a three judge panel?

A.      Legally possible, yes.

Q.      And why is that?

A.      Because with a death penalty specification remaining on the indictment, with a finding of guilt to that specification, either by trial, or as we're talking here, by plea, an acceptance of that plea after hearing testimony, under Ohio law, that's an option. Period. Whether it's an option the Court chooses to follow or not is another story, but it is an option.

Q.      And turning back to that letter, the letter says, "This offer is contingent upon acceptance of the term -- these terms by the Court." What does that mean?

A.      Intention is if for some reason, one or more of the judges wanted to do something less than life without parole, 30 years to life, that we would have to have some assurance that the Court was not going to give some minimum sentence. If we got some indication the Court wasn't going to do life without parole, then we were going to move the offer off the table.

2T. at 266-268.

**{¶35}** Rossi subsequently advised Oswalt that Elmore had accepted the offer, and provided him with a copy of King's acceptance letter. (2T. at 269). A hearing was scheduled before a three-judge panel at which time Elmore was scheduled to formally enter his plea. *(Id.* at 273-74). Oswalt recalls that the three judges were ready to proceed that morning, but that no court hearing actually took place. They were "advised that Elmore had changed his mind." 2T. at 274.

**{¶36}** Oswalt further testified that between February 13, 2003 (the date the three- judge panel hearing was set) until the time of trial, neither Andrew Sanderson nor Brian Rigg requested reinstatement of the resolution proposed in Rossi's letter to King.

*6. Glenn Rossi - Trial Prosecutor*

**{¶37}** Glenn Rossi testified that he was assigned as an assistant prosecuting attorney in Phillip Elmore's capital case, and that he and former Licking County Prosecutor Robert Becker represented the State of Ohio at Elmore's jury trial. [2T. at 283]

**{¶38}** Rossi further testified that he prepared and sent to Elmore's lead counsel, J. Michael King, a written plea offer. Rossi indicated that he was subsequently informed in writing by King that Elmore had accepted the offer. A hearing date was set before a three-judge panel at which time Elmore was scheduled to plead guilty and be sentenced. The morning of the scheduled hearing, Andrew Sanderson informed Rossi "his client was not going to proceed with the plea." (2T. at 288).

**{¶39}** Rossi indicated that he believed Sanderson contacted either Oswalt or him about a possible plea both before and after the February 13, 2003 three-judge panel hearing date. 2T. at 288-289. Rossi indicated that both Sanderson and Rigg had

contacted him about renewing the plea offer. *(Id.* at 305). However, on cross-examination Rossi indicated that he was not sure if Sanderson and/or Rigg had talked to him, talked to Oswalt, or talked to Becker. He did, however, recall that overtures were made about renewing the plea offer. *(*2T. *at* 306-07).

*7. Jon Spahr - Trial Judge*

**{¶40}** Retired Licking County Common Pleas Judge Jon Spahr indicated that he was the presiding judge in Elmore's capital case. [2T. at 317] 53)    In   Elmore's   case, Judge Spahr indicated that the case had been scheduled for a three- judge panel, meaning the parties had reached some sort of agreement on the case. Judge Spahr testified the two other judges would have been Judge Gregory Frost and Judge Robert Hoover. (2T. at 329). The hearing never took place because Elmore did not enter a jury waiver. *(Id.* at 330). He did not learn the reason that the plea hearing did not take place. *(Id.* at 334).

**{¶41}** Judge Spahr further indicated that he has known Andrew Sanderson for more than ten years, and that he would see him weekly when he was sitting as a Common Pleas Judge. (2T. at 342). He also had contact with other attorneys who dealt with Sanderson on a professional basis. (Id. at 343). It was Judge Spahr's opinion that Sanderson has always been truthful and honest. (Id.).

**{¶42}** Judge Spahr stated that he recalled a discussion about resolving Elmore's case without a trial, although he did not "recall the particulars." (2T. at 326). He further stated,

> I know that a judge presiding over a death penalty case is always
> interested in whether or not there will be a plea to it, because death

penalty cases are tough on everybody, and if it can be resolved by a plea,

a judge is going to, you know, to explore that possibility.

(Id.). He also indicated that "a judge [does not] want [] to go through a death penalty case if it can be avoided," and that he would personally give deference to any agreement the parties came up with, as long as the defendant also okayed it. (Id. at 347).

*8. Intervenor Roland T. Davis*

**{¶43}** On February 19, 2013, the first day of the new trial hearing, attorney Randall Porter entered an appearance in the case on behalf of Sanderson's former client, and Porter's current client, Roland Davis. Like Elmore, Davis had been found guilty by a Licking County jury and sentenced to death. Porter informed the court that he had recently learned that testimony might be elicited at the hearing about the Davis case, and he wanted the court to know that Davis had not waived his statutory attorney-client, privilege or his right to confidentiality under Rule 1.6 of the Ohio Rules of Professional Conduct.

**{¶44}** Elmore argued that the testimony of Leigh Bayer would have provided crucial support for Elmore's motion for new trial. She worked at Sanderson's office after Behrens left, and would have been able to provide an independent perspective regarding the office workings and Sanderson's widely known and overwhelming desire to become first chair eligible. She would also have been able to testify that Sanderson was finally able to achieve his coveted goal by co-counseling on the Davis case, an achievement that further supports Behrens' assertion that Sanderson expressed a willingness to do whatever was required to achieve his goal.

**{¶45}** The trial court conducted a voir dire examination of the witness out of the hearing of either party and determined that Bayer's testimony in response to certain questions could violate the attorney client privilege and would not be admitted at the hearing.[4]

**{¶46}** After the conclusion of the evidentiary hearing, the parties submitted post-hearing briefs. On August 30, 2013, the trial court filed a nunc pro tunc Judgment Entry denying Elmore's motion for a new trial.

### D. The Trial Court's Decision.

**{¶47}** The trial court framed the issue,

The issue In this case is whether Elmore is entitled to a new trial because one of his lawyers operated under a conflict of interest that resulted in his failure to provide effective assistance of counsel during the pretrial plea negotiation phase of his trial it is not about whether Elmore's trial attorneys - any one or all of them - should have spent more time and effort urging him to accept the state's plea offer of life without parole.

**{¶48}** The trial court found after reviewing the evidence,

The evidence is insufficient to establish an actual conflict of interest or that he was serving two masters. At best, the evidence suggested that Sanderson's desire to become Rule 20 certified constituted a theoretical division of loyalty, but it was not the driving force behind Elmore's case going to trial. While it is clear that Sanderson made statements indicating a desire or a hope that Elmore's case went to trial, the evidence offered at

---

[4] The transcript of Bayer's in camera testimony was sealed and made part of the record on appeal.

the hearing is insufficient to demonstrate Mr. Sanderson was actually representing, furthering, or serving interests different than from those of his client.

The court finds that the decision to go to trial was Elmore's. Although, he indicated a willingness to accept the State's offer early in 2003, Elmore changed his mind when confronted with a very difficult decision to either (1) accept life in prison without the possibility -of parole and avoid the possibility of the death penalty; or (2) go to trial and have the possibility of receiving a sentence that included parole eligibility after 25 or 30 years but also run the risk of receiving a death sentence.

* * *

Elmore presented no testimony at the hearing on his motion to suggest that Sanderson's advice to him somehow caused him to reject the plea offer that he apparently had accepted before. Elmore himself was completely silent on the matter, and in light of the other evidence presented at the hearing, Elmore's silence was deafening.

* * *

Even if The Court were to assume that Sanderson were laboring under an impossible conflict of interest because of his desire to obtain first chair certification, there was no evidence that Sanderson counseled Elmore to reject the plea There is absolutely no evidence that Elmore based his decision to reject the plea offer on any advice or conduct undertaker by Sanderson.

* * *

Here, Elmore presented no evidence that he would have accepted the plea offer but for Sanderson's advice. At most the evidence suggests that at some point during the litigation Elmore expressed an intent to accept the plea early on, but there was no evidence as to what or who motivated him to change his mind. The fact that Sanderson wanted the case to go to trial is insufficient to establish causation Elmore's claim that it was because of Sanderson's divided loyalties is simply too great of a leap to make based on the evidence presented to [sic.] at the hearing.

{¶49} On January 13, 2014, this Court granted Roland T. Davis' limited motion to intervene for the purpose of addressing Elmore's claims concerning Bayer's testimony.

*Assignments of Error*

{¶50} Elmore raises three assignments of error,

{¶51} "I. TRIAL COUNSEL'S CONFLICT OF INTEREST DEPRIVED APPELLANT OF HIS RIGHT TO THE ASSISTANCE OF COUNSEL AND DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND 'FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

{¶52} "II. PURSUANT TO *LAFLER V. COOPER,* 132 S.CT. 1376 (2012) AND *MISSOURI Y. FRYE,* 132 S.CT, 1399 (2012), APPELLANT ELMORE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PLEA BARGAINING STAGE OF THE PROCEEDINGS AND THE TRIAL COURT'S REFUSAL TO ADDRESS THIS CLAIM WAS ERROR.

{¶53} "III. THE TRIAL COURT ERRED IN ISSUING A BLANKET PROHIBITION AGAINST THE TESTIMONY OF DEFENSE WITNESS LEIGH BAYER IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNTIED STATES CONSTITUTION."

I.

{¶54} In his first assignment of error, Elmore contends that one of his trial attorneys had a conflict of interest that deprived him of his right to the assistance of counsel.

{¶55} We begin by noting that this appeal is from the denial of a motion for a new trial.

### A. Standard of Review – Motion for a New Trial

{¶56} Crim.R.33, which provides the procedure for obtaining a new trial, states in part,

### (A) Grounds

A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;

(3) Accident or surprise which ordinary prudence could not have guarded against;

(4) That the verdict is not sustained by sufficient evidence or is contrary to law. If the evidence shows the defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly, without granting or ordering a new trial, and shall pass sentence on such verdict or finding as modified;

(5) Error of law occurring at the trial;

(6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

\* \* \*

{¶57} "To warrant the granting of a motion for a new trial on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result of a new trial if granted; (2) has been discovered since the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to

former evidence; and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370(1947), syllabus. *Accord*, *State v. Hawkins*, 66 Ohio St.3d 339, 350, 612 N.E.2d 1227(1993), syllabus; *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶85.

{¶58} The decision whether to grant a new trial on grounds of newly discovered evidence falls within the sound discretion of the trial court. *State v. Hawkins*, 66 Ohio St.3d at 350, 612 N.E.2d 1227. We cannot reverse unless there has been a gross abuse of that discretion, and whether that discretion has been abused must be disclosed from the entire record. *State v. Petro,* 148 Ohio St. at 507- 508, 76 N.E.2d 370, q*uoting State v. Lopa*, 96 Ohio St. 410, 411, 117 N.E. 319(1917).

### B. Ineffective Assistance of Counsel - Conflict of Interest

{¶59} The gravamen of Elmore's claim is that his trial attorney Andrew Sanderson convinced Elmore to reject a plea offer that he had previously agreed to and would have saved his life, solely because Sanderson needed to participate in two capital jury trials to qualify for first-chair status under Rule 20 of the Ohio Rules of Superintendence. The newly discovered evidence in the case at bar is the testimony of Shanda Behrens, a former associate of Sanderson's. Behrens testified that after Sanderson became aware that Elmore had accepted the plea offer, Sanderson indicated that he wanted Elmore's case to go to trial because he needed to participate in two capital jury trials to qualify for first-chair status under Rule 20 of the Ohio Rules of Superintendence.

{¶60} The instant case involves a specific type of ineffectiveness claim, that of conflict of interest, which is also examined under a slightly different standard from that

used in a traditional ineffectiveness claim. *Thomas v. Foltz,* 818 F.2d 476,480(6th Cir 1987). The Supreme Court set forth the standard for determining conflict of interest cases in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and summarized it again in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984*)*as follows:

> In *Cuyler* ... [we] held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts ... it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above [actual or constructive denial of the assistance of counsel altogether]. *Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."*

*Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067 (emphasis added) (*quoting Cuyler*, 446 U.S. at 345-50, 100 S.Ct. at 1716-19); *Thomas v. Foltz*, 818 F.2d at 480. *Accord*, *Mikens v. Taylor*, 535 U.S. 162, 171-172, 122 S.Ct. 1237, 152 L.Ed.2d 291(2001). This

standard has been adopted in Ohio. An appellant establishes a claim of ineffective assistance of counsel when he demonstrates that an "actual" conflict of interest adversely affected his counsel's performance. *State v. Keith*, 79 Ohio St.3d 514, 535, 684 N.E.2d 47, 1997–Ohio–367, *citing Cuyler v. Sullivan*), 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333(1980); *State v. Jones,* 5th Dist. Stark Nos. 2007-CA-00041, 2007-CA-00077, 2008-Ohio-1068, ¶76.

{¶61}   In *Foltz,* the United States Court of Appeals for the Sixth Circuit adopted the following test when a conflict of interest claim is raised,

> The standard for determining whether an actual conflict of interest exists was set forth in *United States v. Mers*, 701 F.2d 1321 (11th Cir.), cert. denied, 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983), as follows:

> We will not find an actual conflict unless appellants can point to "specific instances in the record to suggest an actual conflict or impairment of their interests..." Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical." * * * There is no violation where the conflict is "irrelevant or merely hypothetical"; there must be an "actual significant conflict." Id. at 1328 (citations omitted).

618 F.2d at 481.

{¶62} In his direct appeal and in his appeal from the denial of his petition for post conviction relief, Elmore raised numerous instances of alleged ineffective assistance of counsel. *Elmore I; Elmore II.* At no time during those proceedings did Elmore argue that his decision to go to trial was anything other than his own free will. If Elmore had been pressured, cajoled, coerced or mislead into rejecting the plea agreement he would certainly have been able to assert that claim because different counsel represented him in those proceedings. The only basis for asserting that he did not take the plea agreement at this late stage is his claim that he only recently discovered that Sanderson wanted to obtain first chair certification. An asserted desire to obtain lead counsel certification in death penalty cases would, in and of itself, be insufficient to demonstrate an actual conflict of interest. Otherwise, every attorney who is second chair qualified and who desires to obtain first chair certification would be laboring under a conflict of interest in each death penalty case in which he or she participated.

{¶63} Elmore presents only the statement of Behrens and the fact that Elmore changed his plea after meeting with Sanderson on February 13, 2003 to establish an "actual conflict." He then asks this Court to infer from those facts that Elmore's change of heart was somehow brought about by Sanderson's desire to obtain his first-chair status. The record does not contain any evidence that any statements or actions of Sanderson motivated Elmore's decision to reject the plea bargain and proceed to a jury trial.

{¶64} Elmore places emphasis exclusively upon Sanderson's representation. However, Elmore was not left solely to the care of Sanderson. At all times, Elmore had the benefit of a second attorney. The record demonstrates that no less than three

attorneys represented Elmore before the start of his jury trial. Two of those attorneys were certified as first chair counsel. Both King and Rigg testified at the hearing on Elmore's motion for a new trial that Elmore understood the options available to him and the penalties he was facing. In fact, King informed Elmore that if he intended to reject the plea and insist on going to trial, King would resign. King did resign when Elmore rejected the plea offer. Rigg was then appointed to replace him.

{¶65} Further, evidence supports the conclusion that no actual conflict existed. Sanderson clearly and unequivocally testified that he "did not make Phillip Elmore reject the State's proposed resolution." (1T. at 107) Sanderson took steps to counsel Elmore that a plea was still possible. In his letter of March 11, 2003, Sanderson told Elmore that he would pursue a plea if Elmore instructed him to do so. Sanderson also indicted it that letter that he would resign from the case if Elmore so desired. The record contains no evidence to suggest that Elmore instructed Sanderson to pursue a plea after February 13, 2003, or why Elmore did not instruct him to do so.

{¶66} Brian Rigg testifed that discussions of the suggested plea resolution were ongoing after February 13, 2003. Rigg testified that Elmore wanted to speak to family members and Elmore would let Rigg know whether he wanted to plead. The record contains no evidence to refute Rigg's testimony that discussion with Elmore concerning the plea agreement continued after February 13, 2003. Rigg testified that he believed that it was Elmore's decision to reject the plea. The record contains no evidence that Elmore's decision to reject the plea agreement and proceed with a jury trial was motivated by any of his attorneys' advice or action, acting alone or in concert.

**{¶67}** Assistant prosecutor Rossi testified that he believed that Sanderson contacted the prosecutor's office before February 13, 2003, about a possible plea. He further testified that overtures were made about renewing the plea offer after February 13, 2003.

**{¶68}** The record supports the fact that Elmore was presented with the opportunity to plead guilty and chose not to do so. Elmore has never stated that Sanderson advised him to reject the plea agreement and proceed with a jury trial. The record supports the trial court's conclusion that Elmore weighed the advice of all three of his attorneys, and made the ultimate decision about whether to enter into the plea agreement. Elmore cannot eight years later claim ineffective assistance of counsel because he is dissatisfied with results of the choice he made.

**{¶69}** We cannot find the trial court abused its discretion in overruling Elmore's motion for a new trial. The record contains no evidence that Sanderson had an "actual conflict of interest." Further, the record contains no evidence that Sanderson did anything that was motivated by his supposed personal interest in obtaining first-chair capital case certification that adversely affected his representation of Elmore.

**{¶70}** Elmore's first assignment of error is overruled.

II.

**{¶71}** Under his second assignment of error, Elmore begins by asserting that the trial court "would not review Elmore's claim of ineffective assistance of counsel received during the plea bargain stage of his case." (Brief of Appellant, p. 12.) This is an overly broad statement. When framing the issues, the trial court indicated that it would consider Elmore's claim of ineffective assistance of counsel during the plea bargaining

stage of the proceedings. What the trial court declined to consider was Elmore's claim that he suffered from the ineffective assistance of counsel predicated upon the factual allegation that his attorneys failed to present Elmore his options in "a unified voice," and thus did not do enough to "persuade" or "convince" him to enter a plea.

## A. Failure to persuade Elmore to plead guilty

{¶72} The claim that Elmore's attorneys did not do enough to persuade him to accept the plea bargain was first advanced in writing in Elmore's post-hearing memorandum. It was not presented in Elmore's motion for leave to file a motion for a new trial. This theory was also not presented in Elmore's motion for a new trial. Elmore did not seek leave of the trial court to supplement his motion for a new trial with this new theory.

{¶73} Because Elmore's "failure to persuade" claim was not asserted in his motion for new trial the state had no opportunity to prepare for an evidentiary hearing on that claim. More importantly, because this claim was not asserted in his motion for leave to file a motion for new trial, the trial court never had the opportunity to decide if Elmore's "failure to persuade" claim was based upon new evidence that he could not with reasonable diligence have discovered and produced at trial. Crim R. 33(A)(6).

{¶74} Crim R. 33 provides,

### (B) Motion for new trial; form, time

Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and

convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.

Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

{¶75} Thus, an argument could be made that whether his attorneys did or did not do enough to persuade Elmore to plead guilty would be based upon actions occurring in 2003 at the time of Elmore's trial. That evidence would have been within Elmore's own knowledge because he was a part of the discussions. As the actions occurred in 2003 and would have been known to Elmore it could be argued that it is not newly discovered evidence. Elmore would need to have established by clear and convincing evidence that he was unavoidably prevented from the discovery of the evidence upon which he must rely before Elmore could raise it as a ground for obtaining a new trial.

**{¶76}** A trial court abuses its discretion in granting a defendant a new trial without first finding by clear and convincing evidence that the defendant was unavoidably prevented from discovering the evidence within the one hundred twenty day time frame established by Crim.R. 33(B). *State v. Georgekopoulos*, 9th Dist. Summit No. C.A. 21952, 2004-Ohio-5197, ¶8.

**{¶77}** Thus, we find no abuse of discretion in the trial court's decision not to review Elmore's failure to persuade argument.

### B. Ineffective Assistance of counsel during the plea bargaining stage

**{¶78}** Elmore further contends that the trial court failed to apply the U.S. Supreme Court's decisions in *Missouri v. Frye*, __ U.S. __, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012) and *Lafler v. Cooper,* 132 S.Ct. 1376, 182 L.Ed. 398 (2012).

**{¶79}** In *Frye and Lafler*, the Supreme Court set forth a new standard to determine prejudice in context of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) as it applies to plea offers and plea negotiations.

**{¶80}** In *Frye,* defense counsel allowed a plea offer to expire without communicating the offer to the defendant resulting in the defendant accepting a later offer that was less favorable. *Frye,* at 1404. The Court held that "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea...." 132 S.Ct. at 1408. Given this duty, the Court emphasized that the right to effective assistance of counsel extends to the negotiation and consideration of plea offers that have been rejected or have lapsed. Id. at 1407–08.

**{¶81}** In *Lafler,* a favorable plea offer was reported to the client and rejected on the advice of counsel, who advised the defendant that the state could not prove intent

because the victim was shot below the waist, even though the defendant shot the victim three times and missed her head once. The defendant took the case to trial and was convicted, after which he received a sentence more than three times higher than the plea offer. Notably, in an earlier communication with the trial court, the defendant had admitted guilt and expressed a willingness to accept the plea offer.

{¶82} In *Lafler*, the Court reiterated that the Sixth Amendment requires effective assistance not just at trial but at all critical stages of a criminal proceeding, including plea bargaining. 132 S.Ct. at 1384. In order to prevail on a claim of ineffective assistance of counsel when counsel's ineffective advice led to the rejection of a plea offer, the Court held that "a defendant must show that but for the ineffective advice, there is a reasonable probability that [1] the plea offer would have been presented to the court ...; [2] the court would have accepted [the plea];" and (3) the defendant was convicted of more serious offense or received a less favorable sentence than he would have received under the terms of the offer. Id. at 1385.

{¶83} However, defense counsel's deficient performance was stipulated in *Lafler. Id.* at 1383, 1391. The issue of deficient performance was not before the Court and was specifically not addressed. *Id.* at 1384, 1391. In fact, the Court declared, "an erroneous strategic prediction about the outcome of a trial is not necessarily deficient performance." *Id.* at 1391.

{¶84} In the case at bar, there is no stipulation that any of Elmore's attorneys ever counseled him to reject the plea bargain. Rather, as we addressed in our disposition of Elmore's First Assignment of Error, the record established that plea negotiations were ongoing until the eve of trial. The record further confirms that Elmore

was aware of what the penalties he was facing and what options were available to him. *Lafler* is further distinguishable as it arose from a post-conviction proceeding where the defendant stated that he would have pled guilty but for counsel's advice. Elmore did not testify at the hearing on the motion for a new trial. The record contains no evidence that Elmore has ever stated he would have plead guilty but for Sanderson or anyone else's advice. Thus, *Lafler* is in fact distinguishable from the case before us. *State v. Marsh,* 7th Dist. Mahoning No. 12 MA 40, 2013-Ohio-757, ¶25.

**{¶85}** In any event, the record makes clear that Elmore was advised prior to trial that his case was not strong and that acceptance of the plea was advisable. Attorney King even went so far in his attempt to convince Elmore to accept the plea that he told Elmore he would quit if Elmore insisted upon going to trial. Attorney King testified that he was satisfied Elmore did not want to go through with the plea bargain so he withdrew from the case.

**{¶86}** In *Florida v. Nixon*, the United State Supreme Court made the following observation,

> A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger, C. J., concurring). Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

* * *

While a guilty plea may be tactically advantageous for the defendant, [*Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)], at 240, 89 S.Ct. 1709, the plea is not simply a strategic choice; it is "itself a conviction," id., at 242, 89 S.Ct. 1709, and the high stakes for the defendant require "the utmost solicitude," id., at 243, 89 S.Ct. 1709. Accordingly, counsel lacks authority to consent to a guilty plea on a client's behalf, *Brookhart v. Janis*, 384 U.S. 1, 6-7, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); moreover, a defendant's tacit acquiescence in the decision to plead is insufficient to render the plea valid, *Boykin*, 395 U.S., at 242, 89 S.Ct. 1709.

534 U.S. 175, 187-188, 125 S.Ct. 551, 160 L.Ed.2d 565(2004).

**{¶87}** In the case at bar, the record establishes that counsel communicated the state's plea offer to Elmore in conformity with *Frye.* In addition, Elmore makes no argument that defense counsel advised him to reject the plea offer, nor does the record permit the conclusion that defense counsel gave any advice to reject the plea offer in violation of *Lafler. State v. Hills,* 8th Dist. Cuyahoga No. 98848, 2013-Ohio-2902, ¶20.

**{¶88}** Accordingly, the record contains no credible evidence to prove that Sanderson, King, or Rigg was constitutionally ineffective in his representation of Elmore during the plea negotiation process.

**{¶89}** Elmore's second assignment of error is overruled.

### III.

**{¶90}** In his third assignment of error, Elmore argues the trial court erred in issuing a blanket prohibition against the testimony of defense witness Leigh Bayer.

Specifically, Elmore contends the trial court should have allowed Bayer to be called as a witness, and directed Davis' counsel to raise objections to individual questions as they were made. The court could then have addressed each privilege claim individually, rather than lumping them together under a general Rule 1.6 objection. [Appellant's Brief at 28].

## A. The Trial Court's Ruling

{¶91} Roland Davis' current attorney appeared at the hearing on Elmore's motion for a new trial and argued that Bayer's testimony would violate Mr. Davis' attorney client privilege. The trial court conducted a voir dire examination of the witness out of the hearing of either party and determined that,

> THE COURT:        Okay, we're back on the record in the Elmore case, and the Court has conducted an in camera evaluation of Ms. Bayer's testimony in light of the privilege issues that were asserted by Mr. Davis, and based on that in camera evaluation, I have determined that based on Rule 1.6 of the Ohio Rules of Professional Conduct that Ms. Bayer would not be permitted to reveal any information relating to the rep - Mr. Sanderson's representation of Mr. Davis and that the information she would provide *in response to certain questions* regarding statements she might attribute to Mr. Sanderson during that representation would, in my view, violate the privilege, the attorney-client privilege, and potentially reveal confidential information in violation of Rule 1.6. So that ruling is based on my in camera evaluation and the arguments advanced by Mr. Davis' counsel.

I've communicated this ruling before now to the attorneys, and Mr. Lazarow [Elmore's attorney], *do you intend to call Ms. Bayer or have we worked out some sort of procedure by which you might proffer her expected testimony?*

MR. LAZAROW:      Yes, Your Honor, we – the parties have agree to –as a proffer, to submit a copy of the affidavit of Leigh Ann Bayer that was previously filed in the motion - - I believe in the Motion for New Trial.

THE COURT:      Correct. According to the file, it was Exhibit C to the Defendant's Motion for New Trial filed on July 25, 2012.

MR. LAZAROW:      Yes, and agree that if she were called to testify today, she would testify to the substance contained in the affidavit.

2T. at 229(emphasis added).

*1. No blanket prohibition*

**{¶92}** Thus, while the trial court limited the testimony of Ms. Bayer, it did not issue a *blanket prohibition* against her testimony.

**{¶93}** Under the doctrine of "invited error," it is well settled that "a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *State ex rel. Smith v. O'Connor*, 71 Ohio St.3d 660, 663, 1995-Ohio-40, 646 N.E.2d 1115(1995) *citing State ex rel. Fowler v. Smith*, 68 Ohio St.3d 357, 359,1994-Ohio-302, 626 N.E.2d 950(1994). *See, also*, *Lester v. Leuck*, 142 Ohio St. 91, 50 N.E.2d 145(1943) paragraph one of the syllabus. As the Ohio Supreme Court has stated,

[t]he law imposes upon every litigant the duty of vigilance in the trial of a case, and even where the trial court commits an error to his prejudice, he is required then and there to challenge the attention of the court to that error, by excepting thereto, and upon failure of the court to correct the same to cause his exceptions to be noted. It follows, therefore, that, for much graver reasons, a litigant cannot be permitted, either intentionally or unintentionally, to induce or mislead a court into the commission of an error and then procure a reversal of the judgment for an error for which he was actively responsible.

*Lester* at 92-93, quoting *State v. Kollar* (1915), 93 Ohio St. 89, 91, 112 N.E. 196.

{¶94}  In the case at bar, Elmore could have called Bayer to the stand. Instead, Elmore chose to stipulate to her affidavit and agree that if she were called to testify, she would testify to the substance contained in the affidavit. Elmore had possession of that affidavit and had previously filed it in this case.

*2. Elmore consented to the in-camera hearing*

{¶95}  Elmore consented to the trial court conducting the in camera hearing in question:

THE COURT:        All right. We've - - we're back on the record here with the Elmore case. We've had a chance to discuss an issue in chambers regarding some privilege issues with regard to Ms. Bayer's anticipated testimony, and we've discussed procedurally how best to handle those issues, and I think we've agreed or at least no one objects to the Court handling the matter in the following manner.

* * *

[THE COURT:]      I'll conduct an in camera evaluation and then make the rulings on whether or not the State's [sic] objections to her testimony will be sustained or overruled and then also rule on the extent of whether she's permitted to testify and the parameters of the testimony. Does that sum it up pretty much?

MR. MAHER:      Your Honor, that is yes accurate from the State's side, Your Honor.

MR. LAZAROW:      And accurate from Mr. Elmore's.

2T. at 226-227.

**{¶96}** Elmore's failure to object to the ex parte procedure employed by the trial court waived the issue for purposes of this appeal. *In the Matter of: J.E.D.,* 5th Dist. Richland No. 12-CA-107, 2013-Ohio-2186, ¶17; *State v. Riley,* 5th Dist. Muskingum No. CT2012-0022, 2013-Ohio-1332, ¶52. Further, Elmore invited the procedure that he now claims is error. It is well established that "a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *State ex rel. Smith v. O'Connor,* 71 Ohio St.3d 660, 663, 646 N.E.2d 1115 (1995) *citing State ex rel. Fowler v. Smith,* 68 Ohio St.3d 357, 359, 626 N.E.2d 950 (1994).

*3. Harmless Error – Bayer's testimony*

**{¶97}** In addition, even if error occurred in the exclusion of the Bayer's testimony, it was harmless. We note that any error will be deemed harmless if it did not affect the accused's "substantial rights." Before constitutional error can be considered harmless, we must be able to "declare a belief that it was harmless beyond a

reasonable doubt." *United States v. Chapman,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705(1967). Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal. *State v. Lytle,* 48 Ohio St.2d 391, 358 N.E.2d 623(1976), paragraph three of the syllabus, *vacated on other grounds in* (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154(1978). *See also, State v. Jones,* 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶177.

**{¶98}** The substance of Bayer's affidavit, which is unsealed and attached the Elmore's motion for a new trial, is that Sanderson appeared pleased that Mr. Davis desired a trial and that Sanderson would now be eligible to obtain first chair status under Rule 20 of the Ohio Supreme Court Rules of Superintendence. We have likewise reviewed Bayer's sealed testimony given during the in-camera hearing.

**{¶99}** We find any error in the exclusion of Ms. Bayer's testimony to be harmless beyond a reasonable doubt because: 1). Elmore was aware of the substance and nature of Bayer's testimony by virtue of her affidavit; 2).Bayer's testimony does not in any manner address or concern Sanderson representation of Elmore; 2). Bayer's testimony does not provide any evidence that Sanderson did anything that was motivated by his supposed personal interest in obtaining first-chair capital case certification that adversely affected his representation of Elmore, as we have previously discussed in Elmore's First and Second Assignments of Error.

**{¶100}** Elmore's third assignment of error is overruled.

{¶101} Accordingly, the August 30, 2013 Judgment Entry of the Licking County Court of Common Pleas denying Elmore's motion for a new trial claiming newly discovered evidence is affirmed.

By Gwin, P.J.,

Farmer, J., and

Baldwin, J., concur